Wisconsin Employment Relations Board, Appellant, vs. International Association of Bridge, Structural & Ornamental Iron Workers & Shopmen's Local No. 471 and others, Respondents.

*September 14—November 10, 1942.*

288

292

For the appellant there were briefs by the *Attorney General, James Ward Rector,* deputy attorney general, and *N. S. Boardman,* assistant attorney general, and oral argument by *Mr. Boardman.*

For the respondents there were briefs by *Padway & Goldberg* of Milwaukee, and oral argument by *I. E. Goldberg.*

Briefs *amici curiæ* were filed by *Lamfrom, Tighe, Engelhard & Peck* of Milwaukee.

FRITZ, J.    In the opinion pursuant to which the judgment under review was entered, the court stated fairly and at length the facts involved and the court's conclusions in respect

to the material contentions of the respective parties. Upon due and extended consideration on our part of all the matters presented by the parties in connection with their contentions on this appeal, it is our opinion that for the proper disposition thereof it suffices to briefly note the following facts in connection with our conclusions in respect thereto. By the election conducted by the National Board in June, 1937, Local 471 then duly became the exclusive bargaining agent for the production employees of Lakeside, and a contract was then negotiated between them, which ran to February, 1938, and was orally extended by them until February 15, 1938. Thereupon, at varying intervals until September, 1938, negotiations were carried on between the employer and Local 471 without coming to any agreement. Thereafter until May, 1940, all further efforts on the part of Local 471 to effect another contract were held in abeyance and the employment situation continued on without any contract. During that interval the number of members of Local 471, who paid up their dues dropped from one hundred thirteen to five or six, but no action was taken by the union under its rules and regulations in relation to the forfeiture of the membership or reinstatement of the delinquent members. In May, 1940, Local 471 revived its efforts to negotiate a contract with Lakeside and a number of meetings were held between their respective representatives. Finally, as no progress was made in the negotiations, Local 471 started to picket Lakeside's plant on November 4, 1940, and continued this activity until the hearing in the circuit court. In the course of the picketing, the number of pickets consisted of two or three members of Local 471, most of the time, but at times there were as many as twenty; and while patrolling at the entrances of the Lakeside's plant the pickets carried and displayed a banner with the legend "Lakeside Bridge & Steel Company has no contract with Local 471, A. F. L. Please do not patronize." During the period of picketing there was no violence or lawlessness and no interference with

the ingress or egress at the plant. On November 4, 1940, the president of the Milwaukee Building Trades Council, who was also the agent of Bricklayers' Union No. 8 and of Local 113, which were affiliated with that Trades Council, notified the construction company erecting structures on Lakeside's premises that Lakeside had labor trouble with Local 471, and that it had a picket line, and upon being so notified that company had its employees cease with the construction work on Lakeside's premises; and likewise, when another contractor, who was to erect a fence on those premises, requested the business agent of Local 8 to supply him with a crew among its members for that work, the agent said he would not do so until Local 471 ceased picketing activities; and that resulted in stopping that work. Likewise when truck drivers, who were members of Local 200 and were delivering materials for such construction work and for use otherwise in the course of Lakeside's business, learned of the picketing and informed their employers thereof, they were directed by the employers with whom they had contracts, which contained provisions that they should not be required to go through a picket line maintained by an A. F. L. union, to return with their loads or deliver them elsewhere. This stoppage of such deliveries made it necessary for Lakeside to do its hauling with its own employees or have deliveries made by rail, all of which inconvenienced Lakeside in securing materials. There was, however, no interference with or hindrance in the work of any of Lakeside's own employees, and none of them were on a strike.

It is evident from the record that primarily and principally the State Board's order is based upon its conclusions—

"That Local 471 has no present right to demand of Lakeside that it be recognized as collective-bargaining representative of Lakeside's production employees;" and that "Lakeside has had no right nor duty to recognize Local 471 as the collective-bargaining agent of its production employees, based upon the

result of the election held by the National Labor Relations Board June 18, 1937."

and upon the State Board's finding that the legend "Lakeside Bridge & Steel Company has no contract with Local 471, A. F. of L. Please do not patronize," which was on the banner used by the pickets, was a fraud on the public and on other A. F. L. unions, in that it impliedly states that Local 471 has the right to, and Lakeside is free to, make a contract with Local 471, when no such right and no such freedom exists; and that the display of the banner in picketing was fraudulent advertising and all who observed the picket line and read the legend were misled as to the true facts involved in the controversy between Lakeside and Local 471.

The State Board's determination in those respects cannot be sustained. There is no evidence in the record of any fact by reason of which the status of Local 471 as the bargaining agent duly selected at the election conducted by the National Board in June, 1937, by a majority vote of Lakeside's production workers can be deemed to have been terminated. Although many members of the union were in arrears in their dues, because of which their membership could be automatically forfeited or suspended under the union's rules and regulations, subject to reinstatement under certain conditions, there is no proof that they or any of the other production workers had indicated a change in their attitude in respect to having Local 471 continue as their collective-bargaining representative. Moreover, nowhere in the statutes is membership in a union indicated to be a test as to whether a particular union shall be eligible to become or to continue to be the exclusive bargaining representative of a unit of an employer's workers. On the contrary, when duly elected as such representative of all such workers, the union is the representative for all of them regardless of whether or not they are then or thereafter members thereof; and the union's status as such representative is

presumed to continue on behalf of all such workers until the termination thereof in some legally effective manner is shown or authoritatively determined. As the court said on rehearing in *Oughton v. National Labor Relations Board* (3d Cir.), 118 Fed. (2d) 486, 497,—

"The rule of presumed continuity of representative status is but the logical consequence of the realities of the situation. . . . However, it would seem, if the designation of a bargaining agent is to be considered stale, the matter would properly be for the board to weigh along with all factors directly pertinent in the discharge of its duty to dissipate unfair labor practices. The act prescribes no period of limitations to the continuity of a bargaining agent's majority status; and it is not easy to see how the courts may outlaw the choice of a bargaining agent freely made. After all, the selection of a representative for collective bargaining is a matter for the employees of an appropriate unit and for none other. *National Labor Relations Board v. Highland Park Mfg. Co., supra.* Until they take action, as permitted by the act (sec. 9), to express a new choice, the continuity of the bargaining agent's majority must be presumed. *National Labor Relations Board v. Whittier Mills Co., et al., supra; National Labor Relations Board v. Remington-Rand, Inc., supra.*"

That is in accord with decisions in *M. H. Ritzwoller Co. v. National Labor Relations Board* (7th Cir.), 114 Fed. (2d) 432, 437, 438; *National Labor Relations Board v. Highland Park Mfg. Co.* (4th Cir.) 110 Fed. (2d) 632, 640; *Valley Mould & Iron Corp. v. National Labor Relations Board* (7th Cir.), 116 Fed. (2d) 760, 764, 765; *National Labor Relations Board v. P. Lorillard Co.* (6th Cir.) 117 Fed. (2d) 921, 925.

In point, by analogy, in the case at bar are the following conclusions stated in connection with the rule quoted above in the *Highland Park Mfg. Co. Case, supra,*—

"It is reasonable to assume, moreover, that any decline in union membership has been due in large measure to refusal of respondent to bargain with the union as representative of the employees in the manner contemplated by the act of congress;

and, in such situation, an order requiring respondent to bargain as contemplated by the act is reasonably necessary to overcome the effect of the interference with self-organization resulting from the refusal to bargain. An employer should not be allowed to discredit a bargaining agent selected by an overwhelming majority of his employees by refusal to bargain with it and then take advantage of the loss of membership due to his wrongful act as an excuse for refusing to recognize it as a bargaining agent. It must be remembered that the union represents the employees, not the employer; and, if a majority of the employees are not satisfied to be represented by it, they can apply to the board for relief. It is significant that, while the affidavits filed before us state that a majority of the employees are not members of the union and that for some time it has not been the designated or selected representative of the majority, there is nothing in them to the effect that the employees are not willing to have it bargain for them."

Likewise in point are the following conclusions stated in the *Valley Mould & Iron Corp. Case, supra,—*

"As we read the statute, in the board is lodged jurisdiction to determine in a proper manner the unit appropriate for the purpose of collective bargaining. Congress conferred exclusive jurisdiction upon the board to determine the appropriate and selective bargaining unit for employees and gave to it alone proper machinery by way of election for making such determination. Employees have the right to designate their bargaining agent. The board alone may certify the selection and we take it that so long as that certification remains in full force and effect, the organization designated must be recognized. The employer must accord to a certified agent recognition as the proper bargaining agent until the certification is rescinded or succeeded by another. Any other holding would upset orderly procedure and destroy the efficiency of determination by the body authorized to act and maintain the proceedings in a state of suspension and indecision."

In the *Lorillard Case, supra,* the court, after recognizing the rule stated in the *Oughton Case, supra,* added the qualification that,—

"that presumption may be rebutted by lapse of time . . . or by a change in the condition which demonstrates that a shift in sentiment actually exists among the employees, and is caused by other factors than the employer's refusal to bargain collectively."

However, upon the court concluding, in applying that qualification, that the presumption had been rebutted by reason of such circumstances and that therefore there should be a new election ordered by the National Board, the court's decision to that effect was reversed in *National Labor Relations Board v. P. Lorillard Co.* 314 U. S. 512, 62 Sup. Ct. 397, 86 L. Ed. 380.

It follows therefore in the case at bar that, in the absence of appropriate action duly taken in the manner prescribed by law to enable the workers in question to express a new choice as to their collective-bargaining representative or to otherwise evidence definitely the effective termination of the status of Local 471 as such representative, the continuity of its status as such representative must be presumed; and that consequently the State Board was in error in concluding that Local 471 had no right to demand of Lakeside to be recognized as such representative at the times in question. And it also follows that at all of said times it continued to be the duty of Lakeside to recognize Local 471 as such collective-bargaining representative.

Likewise it follows that inasmuch as Local 471 on November 4, 1940, still continued to be authorized and have the right as such bargaining representative to contract with Lakeside, and there was then no contract presently effective, the legend "Lakeside Bridge & Steel Company has no contract with Local 471, A. F. L. Please do not patronize," which was on the banner used by the pickets, was truthful and therefore did not constitute fraudulent advertising or a fraud on other unions or anyone else, or the public at large. As the legend

stated the literal truth, the display thereof as an incident of the picketing cannot be deemed to have characterized the picketing itself as fraudulent. Consequently, the evidence does not admit of the findings made by the State Board in these respects, and they must be disregarded.

In the absence of any such fraud, and the absence, in connection with the picketing and use of the legend, of any violence, lawlessness, interference with the ingress or egress at Lakeside's premises, or other oppressive misconduct, respondents were entitled in the exercise of the right of free speech to publicize the facts in the way in which they did. Consequently, they cannot be prohibited from doing so by any order of the State Board to cease and desist from engaging in, promoting, or inducing such picketing at or near plaintiff's premises; or attempting to induce Lakeside to bargain collectively with Local 471, or to agree to specific terms in a collective-bargaining contract with Local 471. In this case, as Mr. Justice FRANKFURTER said in *American Federation of Labor v. Swing*, 312 U. S. 321, 325, 61 Sup. Ct. 568, 85 L. Ed. 855,—

"All that we have before us, then, is an instance of 'peaceful persuasion' disentangled from violence and free from 'picketing *en masse* or otherwise conducted' so as to occasion 'imminent and aggravated danger.' *Thornhill v. Alabama*, 310 U. S. 88, 105. . . . A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *American Steel Foundries v. Tri-City Council*, 257 U. S. 184, 209. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more

be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in *Thornhill's Case.*"

As Mr. Justice MURPHY said in the *Thornhill Case* (310 U. S. 88, 102–104, 60 Sup. Ct. 736, 84 L. Ed. 1093)—

"In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes, appears to us indispensable to the effective and intelligent use of the process of popular government to shape the destiny of modern industrial society. The issues raised by regulations, such as are challenged here, infringing upon the right of employees effectively to inform the public of the facts of a labor dispute are part of this larger problem. . . . It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. . . . But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests."

And as Mr. Justice JACKSON said in *Bakery & Pastry Drivers, etc., v. Wohl,* 315 U. S. 769, 774, 62 Sup. Ct. 816, 86 L. Ed. 1178,—

"One need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive."

Regardless of whether or not some of the matters demanded by Local 471 may be either prohibited by the state statutes or be permissible under the federal statutes, and whether or not picketing and the other peaceful activities in which defendants engaged, in the absence of any strike by Lakeside's em-

ployees, constituted an unfair labor practice under sec. 111.06 (2) (e), Stats., because they had not been directed by a majority vote of a collective-bargaining unit of Lakeside's employees, there cannot be sustained any order of the State Board in which it purports to prohibit the exercise of the right of free speech in the manner and under the circumstances stated above. As the State Board's order was void in so far as it did so infringe upon the constitutional rights of respondents, the board's petition for the enforcement thereof was rightly denied by the trial court and its judgment to that effect may be affirmed.

*By the Court.*—Judgment affirmed.

FOWLER, J. (*dissenting*). I agree with the proposition discussed in the opinion of the court that Local 471 remained the bargaining agent of the employees of Lakeside until its agency was terminated by an election by the employees of another agent or withdrawn by some other affirmative action of a majority of the employees, but do not agree with the effect given to it. Although the proposition is correct the order of the State Board should nevertheless be affirmed, except par. (d) of div. 1 thereof. The substance of the order is stated in the margin.[1]

---

[1] The material parts of the order of the State Board instantly involved and some comments in connection are here given—

The defendants shall:

1. Immediately cease and desist from

(a) Engaging in promoting or inducing picketing of the Lakeside plant or any place where Lakeside is manufacturing products or where its products are being installed by others.

(b) Attempting to hinder or prevent, or hindering or preventing, by threats, intimidation or coercion of any kind the pursuit of lawful work by employees of Lakeside or by employees of those with whom it is having business relations. *Comment:* There is no evidence of coercion or attempts to coerce employees of Lakeside, but the provision as relating to them if uncalled for is not prejudicial.

(c) Attempting to hinder or prevent, or hindering or preventing, by threats, intimidation or coercion of any kind, the pursuit of lawful work by employees of Lakeside, or employees of those having or at-

The sole ground given in the opinion of the court is that the legend on the banner displayed by the picketers of Lakeside was "literally true." That this does not save picketing banned by a constitutional state statute is held in *Carpenters & Joiners Union of America v. Ritter's Cafe,* 315 U. S. 722, 62 Sup. Ct. 807, 86 L. Ed. 1142. The instant picketing is banned by provisions of the Wisconsin Employment Relations Act that were held valid by this court in the *Golden Guernsey Case (Wisconsin E. R. Board v. Milk, etc., Union),* 238 Wis. 379, 299 N. W. 31. The supreme court on *certiorari* refused to take jurisdiction of the *Golden Guernsey Case,* from which it would seem that they found nothing erroneous in our decision of it. Many of the matters here involved were directly there involved also. In that case, as here, there was involved mass picketing; interference with delivery of materials; engaging in a secondary boycott; and attempting to induce the employer to enter into an all-union agreement when three fourths of the employees had not voted therefor.

The existence of the matters above mentioned was held in the *Golden Guernsey Case, supra,* to render valid the order of the State Board in that case. All of the decisions of the supreme court here relied on by the respondents were relied on by the defendants in the *Golden Guernsey Case,* and it would seem that that case settled the validity of the instant order, unless subsequent decisions of the United States su-

tempting to have business relations with Lakeside. *Comment:* The ban against boycotting Lakeside should be omitted, but the remainder is proper under the statute as it bans a secondary boycott.

(d) Attempting to induce Lakeside to bargain collectively with Local 471. *Comment:* This provision is invalid.

(e) Attempting to induce Lakeside by any means whatever to agree to specific terms in a collective-bargaining contract, the performance of which would be an unfair labor practice. *Comment:* The provision might better specifically limit the ban to attempts to induce an all-union contract, but the general terms are not prejudicial.

(f) Engaging in a secondary boycott against employers performing contracts with Lakeside or supplying materials or making deliveries to it by refusing to furnish labor or service to such employers.

preme court require recession from the position there taken. Two such cases deal with labor relations. One of these is *Carpenters & Joiners Union v. Ritter's Cafe, supra.* That case involved a Texas statute restricting picketing "to the area of the industry within which a labor dispute arises." Ritter's cafe was unionized, and no labor dispute existed between the employer and his employees or the Restaurant Employees' Union to which the employees belonged. Ritter was constructing a building some distance away from the cafe under a contract with Plaster that left to Plaster the employment of the labor used in the construction. Plaster employed nonunion labor. A carpenters' union picketed the cafe and the pickets carried a sign reading "This place is unfair to . . . [naming a carpenters' union and a painters' union]," which was afterwards changed to read "The owner of this cafe has awarded a contract to erect a building to W. A. Plaster who is unfair to . . . [the two unions above indicated]." The purpose of the picketing was to compel Ritter to require Plaster to employ only members of the two unions indicated in the construction of the building. The union to which the employees of the cafe belonged called Ritter's employees out on a strike as a result of the picketing and withdrew the union card of the cafe, and union truck drivers refused to cross the picket line to deliver food and other supplies. The effect of all this was "to prevent members of all trade unions from patronizing" the cafe and "to erect a barrier around plaintiff's cafe, across which no member of defendants' [the picketing] union or its affiliates would go," and to decrease the cafe's patronage sixty per cent. 62 Sup. Ct. 808. The defense was that the statute involved was void as prohibiting free speech. The state court granted an injunction restraining the picketing and the strike. The supreme court of the United States affirmed the judgment. In its opinion the United States supreme court used the following language which fully supports the validity of the provisions of pars. (f) and (g) of sub. (2)

and par. (c) of sub. (1) of sec. 111.06, Stats., under which the State Board's order was held valid in the *Golden Guernsey Case, supra,* and the instant order is valid. See opinion of the case as reported in Supreme Court Reporter, *supra,* at pages 809 and 810:

"The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. . . ." The "circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction [than it would otherwise have] or render it completely inviolable. Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this court is plain."

"While the right of free speech is embodied in the liberty safeguarded by the due-process clause, that clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals, and general welfare of its people. . . . The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' "

"It is true that by peaceful picketing. workingmen communicate their grievances. As a means of communicating the facts of a labor dispute, peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly relating to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the due-process clause would compel the states to allow the dis-

putants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose."

"We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instant of the power of the state to set the limits of permissible contest open to industrial combatants.' "

Four justices of the United States supreme court dissent in the *Ritter's Cafe Case, supra,* but the above quotations declare the law as it presently is and it is for this court to follow that law.

The other case referred to decided since our *Golden Guernsey Case, supra,* was decided is *Bakery & Pastry Drivers, etc., v. Wohl,* 315 U. S. 769, 62 Sup. Ct. 816, 86 L. Ed. 1178. In that case a decision of the New York state courts upheld an injunction under a state statute defining a labor dispute. The ground on which the injunction was granted was that no labor dispute was involved under that definition. The supreme court of the United States reversed the state decision on the ground that the state could not merely by defining a labor dispute, deprive the plaintiff union of its constitutional right of free speech. The plaintiffs were not violating any state statute or doing any other unlawful act. The supreme court's decision expressly recognizes that "a state is not required to tolerate in all places and at all circumstances even peaceful picketing by an individual, notwithstanding the guaranty by the Fourteenth amendment of the right to 'free speech.' " 2 Syllabus of the case. This decision does not affect the validity of the order herein involved.

It would seem that the above is sufficient to justify the instant order of the board without further discussion, but it will perhaps clarify this opinion to state the general principles upon which it is based. Picketing may not be engaged in

when it is unlawful, and whatever is violative of a statute is unlawful, unless the statute is unconstitutional or invalid for some other reason. No ground of invalidity of par. (f), (g), or (c) of the statutes instantly involved is claimed, except that they violate the free-speech provision of the United States constitution. The rights protected by the free-speech provision are not absolute. They may be restricted so far as may be reasonably necessary or reasonably adapted to promote the general welfare. The respondents concede that picketing may be restricted so far as necessary or reasonably adapted to restrain violence. This is so because the use of violence is unlawful. Likewise like restraint may be imposed by the state against picketing when for any other reason it is unlawful. Such in effect is the ruling in *American Furn. Co. v. I. B. of T. C. & H. of A., etc.,* 222 Wis. 338, 367, 268 N. W. 250, wherein it is said that the terms of a statute cannot be stretched to permit a union to enforce by picketing demands which an employer may not lawfully accede to it. The underlying reason of this statement is that such picketing is unlawful. The defendant union could not lawfully picket to compel the instant employer to enter into an all-union contract because three fourths of its employees had not voted for such a contract, and it would be unlawful for the employer to enter into such contract; for it would be unlawful for him to do so under par. (c) of sec. 111.06 (1), Stats., reading as follows:

"(c) To encourage or discourage membership in any labor organization, employee agency, committee, association or representation plan by discrimination in regard to hiring, tenure or other terms or conditions of employment; provided, that an employer shall not be prohibited from entering into an all-union agreement with the representatives of his employees in a collective-bargaining unit, where three-quarters or more of the employees in such collective-bargaining unit shall have voted affirmatively by secret ballot in favor of such all-union agreement in a referendum conducted by the board. . . ."

Nor could the defendant union lawfully picket to prevent delivery of materials to Lakeside required for the performance of its contracts, especially its contracts with the United States government for articles required for naval construction; nor could it picket when the picketing created a secondary boycott. All such picketing is banned by pars. (f) and (g) of sec. 111.06 (2), Stats., which read:

"(2) (f) To hinder or prevent, by mass picketing, threats, intimidation, force or coercion of any kind the pursuit of any lawful work or employment or to obstruct or interfere with entrance to or egress from any place of employment, or to construct or interfere with the free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance.

"(g) To engage in a secondary boycott; or to hinder or prevent, by threats, intimidation, force, coercion or sabotage, the obtaining, use or disposition of materials, equipment or services; or to combine or conspire to hinder or prevent, by any means whatsoever, the obtaining, use or disposition of materials, equipment or services, provided, however, that nothing herein shall prevent sympathetic strikes in support of those in similar occupations working for other employers in the same craft."

While pars. (f) and (g) of (2) and par. (c) of (1) by the opening clause of sec. 111.06, Stats., run against employers and employees and those acting with them, sub. (3) of the statute bars any person doing or causing to be done anything prohibited by par. (c), (f), or (g) "in connection with or to influence the outcome of any controversy as to employment relations." That the picketing involved accomplished the prohibited things next above specified covered by pars. (c), (f), and (g) was found by the State Board and is without dispute.

As to the claim that doing these things violates the defendants' rights of free speech, they do not violate those rights if the statute itself does not violate them. No statute is void

as violative of the free-speech constitutional provision where there is a balancing of the considerations for the protection of public welfare against those for the protection of free speech, and there is reasonable ground for judging that the former overbalance the latter. This is expressly recognized in the *Ritter Cafe* decision, *supra,* and is in effect held in the *Meadowmoor Dairies Case,* 312 U. S. 287, 61 Sup. Ct. 552, 85 L. Ed. 836. There was such a balancing of considerations by the legislature in enacting the Employment Relations Act. Sec. 111.01 (4) of the act declares:

. "It is the policy of the state, in order to preserve and promote the interests of the public, the employee, and the employer alike, to establish standards of fair conduct in employment relations and to provide a convenient, expeditious and impartial tribunal by which these interests may have their respective rights and obligations adjudicated. . . ."

· The supreme court of the United States has no more lawful right or power to override that legislative judgment in enacting the instant act than it had to override the state legislatures in the *Meadowmoor* and *Ritter Cafe Cases,* supra. But may be that for trivial or unimportant considerations it might be held unconstitutional to apply the statute to ban picketing. The act of the defendants in stopping the construction of a building deemed by the government necessary to provide for the manufacture of articles for the navy for use in the common defense, or in stopping the construction of a fence deemed by the government necessary for the protection of the Lakeside plant to enable Lakeside to properly perform its contract for naval construction, certainly cannot be held not unreasonably to overbalance the exercise of the defendants' claimed right of free speech to compel unionization of the Lakeside plant. The considerations for protection of the public welfare in the respect stated most certainly overbalance the right of the defendants' free speech, and that right was properly restricted by the State Board. The facts that the

Lakeside was engaged in performing naval construction contracts, and that the building and fence above mentioned were being erected for the purpose stated, are not mentioned in the statement of facts preceding the opinion of the majority or in the opinion, but the State Board so found, and the evidence supporting the finding is without dispute.

For the reasons above stated, the judgment of the circuit court should be reversed with directions to modify the order of the State Board as indicated in this opinion and affirm it as modified.

FAIRCHILD, J. (*dissenting*). As I understand the record, the union was not at the time of the alleged unfair labor practice the representative of the employees. After the election of 1938 when the national labor board decided that the union was the representative, there was a drop in membership in the union from one hundred thirteen to five or six which was clearly not attributable to any acts of the employer. This, as I understand it, is without dispute and consequently the union could not be the representative of a majority of the employees. This fact together with the lapse of a long period of time must constitute an abandonment of the representative relation. In this case the national board has had no occasion to consider the present status of the union, and I see no reason why in deciding a matter properly within the province of state regulation the state authority cannot decide as a matter of fact that the union is no longer the bargaining agent of the employees. This is not a case like *National Labor Relations Board v. P. Lorillard Co.* 314 U. S. 512, 62 Sup. Ct. 397, 86 L. Ed. 380, where the national board had acted and the court sought to substitute its discretion for that of the board.

If what I have said is true, then there was no labor dispute and the resort by Local 471 to the practice engaged in was unwarranted.