BAKERY & PASTRY DRIVERS & HELPERS LO-
CAL 802 OF THE INTERNATIONAL BROTHER-
HOOD OF TEAMSTERS ET AL. *v.* WOHL ET AL.

No. 901, October Term 1940. Argued January 13, 1942.—Decided
March 30, 1942.

*Mr. Edward C. Maguire,* with whom *Mr. Samuel J. Cohen* was on the brief, for petitioners.

*Mr. Arthur Steinberg,* with whom *Mr. Joseph Apfel* was on the brief, for respondents.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The petitioners are a labor union and certain of its officers. The union membership consists of truck drivers occupied in the distribution of baked goods. The respondents Wohl and Platzman are, and for some years have

been, peddlers of baked goods. They buy from bakeries and sell and deliver to small retailers, and keep the difference between cost and selling price, which in the case of Wohl is approximately thirty-two dollars a week, and in the case of Platzman, about thirty-five dollars a week. Out of this each must absorb credit losses and maintain a delivery truck which he owns—but has registered in the name of his wife. Both are men of family. Neither has any employee or assistant. Both work seven days a week, Wohl putting in something over thirty-three hours a week, and Platzman about sixty-five hours a week. It was found that neither has any contract with the bakeries from whom he buys, and it does not appear that either had a contract with any customer.

The conflict between the union and these peddlers grows out of certain background facts found by the trial court and summarized here. The union has for some years been engaged in obtaining collective bargaining agreements prescribing the wages, hours, and working conditions of bakery drivers. Five years before the trial, there were in New York City comparatively few peddlers or so-called independent jobbers—fifty at most, consisting largely of men who had a long-established retail trade. About four years before the trial, the social security and unemployment compensation laws, both of which imposed taxes on payrolls, became effective in the State of New York. Thereafter, the number of peddlers of bakery products increased from year to year, until at the time of hearing they numbered more than five hundred. In the eighteen months preceding the hearings, baking companies which operated routes through employed drivers had notified the union that, at the expiration of their contracts, they would no longer employ drivers, but would permit the drivers to purchase trucks for nominal amounts, in some instances fifty dollars, and thereupon to continue to distribute their baked goods as peddlers. Within such period, a hundred

and fifty drivers, who were members of the union and had previously worked under union contracts and conditions, were discharged and required to leave the industry unless they undertook to act as peddlers.

The peddler system has serious disadvantages to the peddler himself. The court has found that he is not covered by workmen's compensation insurance, unemployment insurance, or by the social security system of the State and Nation. His truck is usually uninsured against public liability and property damage, and hence commonly carried in the name of his wife or other nominee. If injured while working, he usually becomes a public charge, and his family must be supported by charity or public relief.

The union became alarmed at the aggressive inroads of this kind of competition upon the employment and living standards of its members. The trial court found that if employers with union contracts are forced to adopt the "peddler" system, "the wages, hours, working conditions, six-day week, etc., attained by the union after long years of struggle will be destroyed and lost." In the spring of 1938, the union made an effort in good faith to persuade the peddlers to become members, and those who desired were admitted to membership and were only required to abide by the same constitution, by-laws, rules and regulations as were all other members. That, however, included a requirement that no union member should work more than six days per week.

These particular peddlers were asked to join the union, and each signed an application, but neither joined. The union then determined to seek an understanding with peddlers who failed to join the union that they work only six days a week and employ an unemployed union member one day in a week. The union did not insist that the relief man be paid beyond the time that he actually worked, but

asked that he be paid on the basis of the union's daily wage, which fixed a scale for part of a day if but part of a day was required for the service of the route. For some ten weeks, Wohl employed a relief driver, who was paid $6.00 per day, the normal day's wage for a full day being $9.00.

When Wohl and Platzman finally refused either to join the union or to employ a union relief man, and continued to work seven days each week, the union took the measures which led to this litigation. On the twenty-third of January, 1939, the union caused two pickets to walk in the vicinity of the bakery which sold products to Wohl and Platzman, each picket carrying a placard, one bearing the name of Wohl and the other that of Platzman, and under each name appeared the following statement: "A bakery route driver works seven days a week. We ask employment for a union relief man for one day. Help us spread employment and maintain a union wage hour and condition. Bakery & Pastry Drivers & Helpers Local 802, I. B. of T. Affiliated with A. F. L." The picketing on that day lasted less than two hours. Again, on the twenty-fifth of January, the union caused two pickets to display the same placards in the same vicinity for less than an hour; and on the same day a picket with a placard bearing the name of Wohl over the same statement, picketed for a very short time in the vicinity of another bakery from which Wohl had purchased baked products. It was also found that a member of the union followed Platzman as he was distributing his products and called on two or three of his customers, advising them that the union was seeking to persuade Platzman to work but six days per week and employ a union driver as a relief man, and stating to one that, in the event he continued to purchase from Platzman, a picket would be placed in the vicinity on the following day, with a placard reading as set forth above. It does not appear that this threat was carried out.

The trial court found that the placards were truthful and accurate in all respects; that the picketing consisted of no more than two pickets at any one time and was done in a peaceful and orderly manner, without violence or threat thereof; that it created no disorder; that it was not proved that any customers turned away from such bakeries by reason of the picketing; and it was not established that the respondents sustained any monetary loss by reason thereof.

The trial court issued injunctions which restrained the union and its officers and agents from picketing either the places of business of manufacturing bakers who sell to the respondents or the places of business of their customers. 14 N. Y. Supp. 2d 198. The judgment was affirmed without opinion by the Appellate Division of the First Department, two Justices thereof dissenting with opinion, 259 App. Div. 868, 19 N. Y. S. 2d 811; and was affirmed without opinion by the Court of Appeals, 284 N. Y. 788, 31 N. E. 2d 765. This Court denied a petition for a writ of certiorari because it did not appear that the federal question presented by the petition had necessarily been decided by the Court of Appeals. 313 U. S. 572. The Court of Appeals later certified that such question had been passed upon, a petition for rehearing was granted, the writ of certiorari granted, and the judgment summarily reversed. 313 U. S. 548. We later granted another petition for rehearing, 314 U. S. 701, and have since heard argument.

The controversy in the trial court centered about the issue as to whether a labor dispute was involved within the meaning of New York statutes. The trial court found itself constrained to hold that no labor dispute was involved, and seemed to be of the impression that therefore no Constitutional rights were involved. It concluded as a matter of law that the respondents "are the sole persons required to run their business and therefore they are not

subject to picketing by a union or by the defendants who seek to compel them to employ union labor." The trial court refused the petitioners' request for a finding that "it was lawful for the defendants to truthfully advise the public of its cause, whether in the vicinity of the places of business of bakers who sold to the plaintiffs, or otherwise." Likewise, it refused a request to find "that it was a constitutional right of the defendants to advise the public, accurately and truthfully and without violence or breach of the peace, that defendants worked seven days a week, and that the defendants were seeking to secure employment from the plaintiffs for unemployed members of the union, one day a week."

So far as we can ascertain from the opinions delivered by the state courts in this case, those courts were concerned only with the question whether there was involved a labor dispute within the meaning of the New York statutes, and assumed that the legality of the injunction followed from a determination that such a dispute was not involved. Of course that does not follow: one need not be in a "labor dispute" as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive.

The respondents say that the basis of the decision below was revealed in a subsequent opinion of the Court of Appeals, where it was said with regard to the present case that "we held that it was an unlawful labor objective to attempt to coerce a peddler employing no employees in his business and making approximately thirty-two dollars a week, to hire an employee at nine dollars a day for one day a week." *Opera-on-Tour* v. *Weber,* 285 N. Y. 348, 357, 34 N. E. 2d 349, certiorari denied, 314 U. S. 615. But this lacks the deliberateness and formality of a certification,[1]

---

[1] Compare *Ex Parte Texas,* 315 U. S. 8.

and was uttered in a case where the question of the existence of a right to free speech under the Fourteenth Amendment was neither raised nor considered.

We ourselves can perceive no substantive evil of such magnitude as to mark a limit to the right of free speech which the petitioners sought to exercise. The record in this case does not contain the slightest suggestion of embarrassment in the task of governance; there are no findings and no circumstances from which we can draw the inference that the publication was attended or likely to be attended by violence, force or coercion, or conduct otherwise unlawful or oppressive; and it is not indicated that there was an actual or threatened abuse of the right to free speech through the use of excessive picketing. A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual. But so far as we can tell, respondents' mobility and their insulation from the public as middlemen made it practically impossible for petitioners to make known their legitimate grievances to the public whose patronage was sustaining the peddler system except by the means here employed and contemplated; and those means are such as to have slight, if any, repercussions upon the interests of strangers to the issue.

The decision of the Court of Appeals must accordingly be

*Reversed.*

Mr. Justice Roberts took no part in the consideration or decision of this case.

Mr. Justice Douglas, concurring:

If the opinion in this case means that a State can prohibit picketing when it is effective but may not prohibit it when it is ineffective, then I think we have made a basic departure from *Thornhill* v. *Alabama,* 310 U. S. 88. We

held in that case that "the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." p. 102. While we recognized that picketing could be regulated, we stated (p. 104-105): "Abridgment of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion." And we added (p. 105): "But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter." For that reason we invoked the test, employed in comparable situations (*Cantwell* v. *Connecticut*, 310 U. S. 296, 307; *Bridges* v. *California*, 314 U. S. 252) that the statute which is the source of the restriction on free speech must be "narrowly drawn to cover the precise situation giving rise to the danger." p. 105.

We recognized that picketing might have a coercive effect: "It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society." p. 104.

Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those as-

pects of picketing make it the subject of restrictive regulation.

But since "dissemination of information concerning the facts of a labor dispute" is constitutionally protected, a State is not free to define "labor dispute" so narrowly as to accomplish indirectly what it may not accomplish directly. That seems to me to be what New York has done here. Its statute (Civil Practice Act, § 876a), as construed and applied, in effect eliminates communication of ideas through peaceful picketing in connection with a labor controversy arising out of the business of a certain class of retail bakers. But the statute is not a regulation of picketing *per se*—narrowly drawn, of general application, and regulating the use of the streets by all picketeers. In substance it merely sets apart a particular enterprise and frees it from all picketing. If the principles of the *Thornhill* case are to survive, I do not see how New York can be allowed to draw that line.

MR. JUSTICE BLACK and MR. JUSTICE MURPHY join in this opinion.