UNITED STATES of America,
Plaintiff,

v.

LOS ANGELES MEAT AND PROVISION DRIVERS UNION, LOCAL 626, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Meyer Singer, Lee Taylor, Hubert Brandt, Walter Klein, and Harold Carlis, Defendants.

No. 515-59.

United States District Court
S. D. California,
Central Division.
June 30, 1961.

George B. Haddock, Maxwell M. Blecher, Antitrust Div., Dept. of Justice, Los Angeles, Cal., for plaintiff.

Brundage, Hackler & Flaum, Los Angeles, Cal., for defendants.

BYRNE, District Judge.

The United States filed its complaint under Section 4 of the Sherman Act (15 U.S.C.A. § 4) seeking to prevent and restrain a continuing violation by defendants of Section 1 of the Act (15 U.S.C.A. § 1).

The defendant Los Angeles Meat and Provision Drivers Union, Local 626, is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and has its principal place of business in Los Angeles, California. Defendant Meyer Singer is business representative of the Union who actively managed and coordinated the affairs and acts of the grease peddler members of the Union. Defendants Lee Taylor, Hubert Brandt, Walter Klein and Harold Carlis are grease peddler members of the Union.

"Grease peddlers" are defined as independent businessmen who are in the business of buying, transporting and selling waste restaurant grease for their own account. These self-employed peddlers have no established place of business; no employees, except an occasional loader; no capital investment, except a small equity in a truck; no skill or special qualifications except the ability to load, unload and drive a truck. Grease peddlers drive from restaurant to restaurant picking up small amounts of waste grease in cans and, on the same day, transport and unload the entire collection to one of the processing companies. Their earnings represent the difference between the buy and sell price of the waste grease, diminished by the cost of maintaining and operating the truck.

The processing companies who buy the waste restaurant grease from the peddlers then convert it into yellow grease, which they sell either directly to buyers in foreign countries or to buyers in California for shipment to foreign countries. Therefore, any restraint on or disruption in, or interference with, the purchase of waste restaurant grease by peddlers and its sales to processors, and any suppression or elimination of competition in the purchase and sale of waste grease by processors from peddlers, necessarily and directly restrains and affects the flow of yellow grease in foreign commerce.

Prior to 1954, the grease peddlers of Los Angeles were not members of, or in any way affiliated with, any labor union. However, in the fall of 1954, the defendant Singer, a business agent of defendant Union, and certain grease peddlers, caused most of the grease peddlers in Los Angeles County to become members of defendant Union. In soliciting their membership, Union representatives, including defendant Singer, proposed the following general plan: The Union would increase the profits of the grease peddlers by increasing the margin between the prices paid by said peddlers for restaurant grease and the prices they would be paid by processors; grease peddlers would be prevented from soliciting or buying grease from the accounts of other peddlers; the processors would be required to deal only with those grease peddlers who were members in good standing of the Union; and unless grease peddlers became members of the Union, they

would have no place to sell their restaurant grease and would be forced out of business.

In October 1954, a majority of grease peddlers in Los Angeles County, including defendants Taylor, Brandt, Klein and Carlis, joined the defendant Union, thereby agreeing to make operative the plan outlined by defendant Singer and other Union representatives.

During the period between October 1954 and May 27, 1959 (the period covered by the complaint), there were in Los Angeles County about 40 to 50 grease peddlers, 35 to 45 of whom were members of defendant Union. After April 1955, these grease peddlers held their membership in a subdivision of the Union known as Local 626–B.

During this same period, there were in Los Angeles County eight processors of yellow grease, six of which acquired all or most of their waste grease from grease peddlers.

The parties filed a stipulation providing that seventy-two facts set forth therein were admitted, required no proof and should be accepted by the court as being true for purposes of the instant action. These facts relate in detail the plan and the activities of the defendants, and support fully the allegations of the complaint that defendants were guilty of price-fixing and elimination of competition in the gathering and sale of waste grease in the Los Angeles area.

It is further stipulated:

1. That the acts of defendants and their co-conspirators constitute a direct, substantial and unreasonable restraint upon foreign trade and commerce in yellow grease.

2. That defendants unlawfully combined and conspired in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

3. That the court may enter judgment that defendants have violated Section 1 of the Sherman Act as charged in the complaint.

4. That plaintiff is entitled to injunctive relief perpetually enjoining defendants from participating, and from forcing the processors to participate, in any plan the purpose and effect of which is to fix prices and eliminate competition in the peddlers' gathering grease and selling it to processors.

The sole remaining issue in the case is whether the decree should include a provision that the Union be ordered to terminate the membership of peddlers and be perpetually enjoined from accepting peddlers as members, unless they become bona fide employees, and that the peddler defendants be enjoined from holding membership in and participating in the affairs of the Union, unless they become bona fide employees.

Defendants' first argument in opposition to the ouster of peddlers from defendant Union, is that "membership of peddlers in a union does not transform the union into an illegal combination in restraint of trade under the antitrust laws." The proposition thus stated appears to be pointless, inasmuch as plaintiff and defendants have stipulated to the fact that the defendants (including the Union and its peddler members) *"unlawfully combined* and conspired *in unreasonable restraint of foreign trade* and commerce in yellow grease *in violation of Section 1 of the Sherman Act."* (Italics added.)

The issue at hand is whether, under the facts as stipulated, the court may properly enter a decree compelling the defendant Union to oust its peddler members. Defendants cite many Supreme Court cases which they claim condone a union's taking independent contractors into membership. Therefore, what defendants are presumably arguing is that since there is nothing illegal per se about an independent contractor's joining a union, this court has no power to compel the expulsion of defendant peddlers from defendant Union.

It may be noted at the outset that the precise issue of whether an independent contractor may properly join a union appears never to have been before the Supreme Court. At any rate, this issue was not decided in any of the cases cited by

defendants in their brief. A reading of these cases discloses that only in the most indirect fashion did the court indicate its views as to the propriety of extending union membership to independent contractors, jobbers, vendors, or the like.

For example, in Bakery and Pastry Drivers and Helpers Local, etc. v. Wohl, 1941, 315 U.S. 769, 62 S.Ct. 816, 86 L. Ed. 1178, in an effort to compel peddlers (independent jobbers) to join the bakery drivers' union, members of that union had peacefully picketed bakeries from which peddlers obtained their goods, carrying placards with the peddlers' names and a true statement of the union's grievances. The Supreme Court held that a state court injunction against such picketing was an unconstitutional invasion of the right of free speech.

From the facts and the decision of the Bakery Drivers case, it may be obliquely inferred that peddlers can join, or properly be coerced to join, a union when they are engaged in the same kind of work as union members and *compete* with the members, thus lowering the working conditions and wages of the latter.

Another case cited by defendants is Milk Wagon Drivers' Union etc. v. Lake Valley Farm Products, 1940, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63. Here, the Supreme Court held there existed a "labor dispute" within the meaning of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.; and, the requirements of this Act not having been met, the District Court had no jurisdiction to grant an injunction, notwithstanding that the suit was based upon alleged violation of the Sherman Act. The Milk Wagon Drivers' court did not pass even indirectly upon the question of whether the picketing had a legitimate objective. The only point of the case for the purpose of this discussion is that it furnishes another instance of a union's attempt to compel the joinder of self-employed persons whose activities tend in some manner to compete with the functions of union members, thus affecting unfavorably the wages and employment of the union members.

Upon the basis of the Bakery Drivers and Milk Wagon Drivers' cases, supra, it may be said that the Supreme Court apparently and impliedly sanctions the union's coercing the joinder of independent contractors, jobbers or vendors (1) if these groups compete with union members by doing the same or similar work; and (2) if the object of having these groups join the union is to eliminate their unfair competition with union members, and the consequent lowering of the wages and working conditions of union members.

■ In the instant case, the facts contained in the stipulation show that neither of these conditions for the proper joinder of independent contractors with a labor union, is present.

The members of defendant Union (Los Angeles Meat and Provision Drivers Union, Local 626) are truck drivers engaged in loading, unloading and transporting meat and meat products for packing houses and related employers. Every processor of yellow grease in the Los Angeles area has employees who are members of the defendant Union.

The grease peddler defendants are independent, self-employed businessmen who purchase waste grease from restaurants and other institutions, and then transport the grease in their own trucks to the processing companies, to whom they sell the grease.

These facts do not show that there is competition between the peddlers and the union employees of the processors. On the contrary, there is no competition between these groups because each is engaged in a different line of work, the peddlers buying grease, transporting and selling it to the processors, and the union members performing other functions for their employers (the processors).

The defendant Union solicited the membership of the peddler defendants not for the purpose of raising the wages and working conditions of the peddlers and the union employees of the processors, but for the sole purpose of increasing the income of the peddlers alone, and

enabling the Union, the peddlers and the processors to control the business of purchasing and selling waste grease in the Los Angeles area.

In United States · v. Fish Smokers Trade Council, Inc., D.C.S.D.N.Y.1960, 183 F.Supp. 227, which is quite similar on its facts to the instant case, the court concluded 'that the jobbers (independent businessmen) were not a proper subject of unionization because, regardless of how the jobbers were characterized, there was no competition between them and the union employees.

The Fish Smokers case involved a suit under Section 4 of the Sherman Act to prevent and restrain continuing violations by defendants of Section 1 of the Act. There, the defendant Union had a total membership of about 700, of which about 75 were jobbers (the counterpart of the peddlers here) who purchased fish from smokehouses for resale to customers. The remaining members of the defendant Union were true employees, a number of whom performed the same function in their capacity as employees of the employer smokehouses, i. e., the employees delivered the fish from the smokehouses to wholesale or retail outlets. The jobbers had joined the Union because of an agreement between the Union and the smokehouses providing that the latter would not sell fish to jobbers who were not Union members. This agreement the Union enforced by threats of strikes against smokehouses refusing to boycott non-Union jobbers.

Under these facts, the court concluded that the jobbers were not properly Union members, stating at pages 234 and 235 of 183 F.Supp.:

*"If the work and functions they* [the jobbers] *performed in the smoked fish industry conflicted with or competed with the work and functions performed by the chauffeur employees of the smokehouses, and affected the hours, working conditions and wages of these men, then, regardless of what they called themselves, the jobbers would lawfully be forced into the Union.* However,

it is evident that the mere fact that the jobbers worked long hours and at times earned less than the chauffeur employees had no effect on the working conditions or wages of the chauffeurs—other than the inevitable causal effect which demand or lack of demand of smoked fish by the jobbers and their customers would have on its production by the smokehouses and  *  *  *  their employees. *There was no competition in any respect between the chauffeurs and the jobbers*—if any, it was between the smokehouses who sold retail and the jobbers. *Although the physical aspect of the work of these two groups is similar, 'the economic and social difference between them lies in the method of compensation and return for their toil.'* People v. Distributors Division, 169 Misc. 255, 7 N.Y.S.2d 185, 187. (Italics added.)

"The demands which were made by the Union of the smokehouses on behalf of the jobbers in 1954—excepting perhaps that concerning the welfare and pension funds—were purely the demands and requirements of an independent business man having to do with extension of credit, price and discrimination, and not with wages, working conditions or hours, of employees.  *  *  * ”

Thus, the rationale of the court in the Fish Smokers case, supra, appears to substantiate the inference drawn from the two Supreme Court cases discussed earlier, namely, that the membership of so-called "independent contractors" in a labor union is not proper unless the purpose of the membership is to secure better wages and working conditions for all union members through the elimination of competition caused by the fact that the independent contractor and the union employees perform the same function.

However, the true significance of the Fish Smokers case is not that it merely states the circumstances under which independent contractors may not properly

be forced into a union. Rather, the real importance of this decision lies in the fact that it indicates the *result* of such a misalliance, which is that the union and the independent contractors have put together a combination in restraint of trade, in violation of the Sherman Act. The court makes this clear by stating at page 229 of 183 F.Supp.:

"There is one principal issue raised by the pleadings and that is whether the jobbers are independent business men as plaintiff maintains and therefore not a proper subject of unionization; if they are, then it follows that the defendants' alleged activities in forcing them into the Union and into agreements to allocate their customers is an act in restraint of trade within the stricture of the antitrust laws, Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939. If, however, these jobbers are a labor group as defendants contend, then their activities are protected by the Clayton and Norris-La Guardia Acts and under Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63."

and again at page 234:

"But whether such agreement among the smokehouses, the Union and the jobbers was simply the usual closed shop labor agreement in order 'to see that each of them (the Jobber) earns a living, and that not one guy gets it all * * * and that everyone gets an even break', as defendant argues, and consequently lawful under the Milk Wagon Drivers' Union decision, or whether it was really a conspiracy masquerading as a labor agreement in order to restrain competition between business men as in Allen Bradley Co. v. Local Union No. 3, supra, * * *, depends on whether the jobbers, although so-called independent business men, were really a labor group."

Defendant peddlers and the defendant Union's employees in this case did not compete with each other. Therefore, the peddlers are not a labor group and are not the proper subject of unionization. Moreover, in this case the peddlers were taken into the defendant Union for the purpose of raising their income and enabling the Union, the peddlers and the processors to put together a combination to control the business of buying and selling waste grease in the Los Angeles area, thereby restraining foreign commerce in yellow grease in violation of the Sherman Act.

Defendants contend that it is not possible to grant the relief sought by plaintiff because of Section 6 of the Clayton Act [15 U.S.C.A. § 17] [1] and Section 4 (b) of the Norris-La Guardia Act [29 U.S.C.A. § 104(b)] [2].

[1] Title 15 U.S.C.A.

"§ 17. Antitrust laws not applicable to labor organizations

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purpose of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

[2] Title 29 U.S.C.A.

"§ 104. Enumeration of specific acts not subject to restraining orders or injunctions

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

* * * * *

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as described in section 103 of this title;"

■ It has long been settled law that neither the Clayton Act nor the Norris-La Guardia Act permits labor unions to combine with other, non-labor groups for the purpose of monopolizing trade in violation of the Sherman Act. Allen Bradley Co. v. Local Union No. 3, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939; Columbia River Packers Ass'n v. Hinton, 1942, 315 U.S. 143, 62 S.Ct. 520, 86 L. Ed. 750.

In Allen Bradley Co. v. Local Union No. 3, supra, the Electrical Workers Union and its members, prompted by the desire to get and hold jobs for themselves at good wages and under high working standards, combined with employers and manufacturers of electrical equipment to restrain competition in, and to monopolize the marketing of, electrical equipment. The Supreme Court held that the Union's activities constituted a violation of the Sherman Act, despite the provisions of the Clayton and Norris-La Guardia Acts. In this regard, the court made the following pertinent observations at pages 809 and 810 of 325 U.S., at page 1539 of 65 S.Ct.:

" * * * Since union members can without violating the Sherman Act strike to enforce a union boycott of goods, it is said they may settle the strike by getting their employers to agree to refuse to buy the goods. Employers and the union did here make bargaining agreements in which the employers agreed not to buy . goods manufactured by companies which did not employ the members of Local No. 3. We may assume that such an agreement standing alone would not have violated the Sherman Act. But it did not stand alone. It was but one element in a far larger program in which the contractors and manufacturers united with one another to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level. * * * [W]hen the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-La Guardia Acts. (Italics added.)

"It must be remembered that the exemptions granted the unions were special exceptions to a general legislative plan. The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective. For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves. Seldom, if ever, has it been claimed before, that by permitting labor unions to carry on their own activities, Congress intended completely to abdicate its constitutional power to regulate interstate commerce and to empower interested business groups to shift our society from a competitive to a monopolistic economy. Finding no purpose of Congress to immunize labor unions who aid and abet manufacturers and traders in violating the Sherman Act, we hold that the district court correctly concluded that the respondents had violated the Act." (Italics added.)

Columbia River Packers Ass'n v. Hinton, 1942, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750, is another instance where the Supreme Court held that injunctive relief was not barred by the Norris-La Guardia Act, when a violation of the Sherman Act was involved.

■ In the instant case, Section 6 of the Clayton Act (15 U.S.C.A. § 17, supra) does not sanction the alliance of

the peddler defendants and the defendant Union, because such alliance was not formed for the purpose of "mutual help", but rather for the purpose of enabling the peddlers, the Union and the processors together to obtain control of the waste grease trade in the Los Angeles area, with consequent restrictions upon the free flow of yellow grease in foreign commerce. As stated in the Allen Bradley case, supra, Congress did not intend to permit violations of the Sherman Act to go unpunished merely because a labor union is one of the parties to the unlawful combination condemned by that Act.

█ Nor does the Norris-La Guardia Act furnish refuge for the defendants. The strikes and picketing here involved are not "labor disputes" within the meaning of the Act: for these disputes grew out of the refusal of some of the processors to buy waste grease only from Union peddlers, and in no way related to the improvement of wages or working conditions of the Union members. The instant case is clearly parallel to the Columbia Packers case, supra, in that the disputes centered about the processors' purchase of a commodity (waste grease), and in nowise related to the employer-employee relationship. Therefore, Section 4(b) of the Norris-La Guardia Act (29 U.S.C.A. § 104(b), supra) does not prohibit the issuance of a decree which would terminate the membership of grease peddlers in defendant Union.

Defendants assert that this court cannot frame a decree compelling defendant Union to oust its grease peddler members, because such a decree would violate due process by abrogating the contract rights of those who are not parties to the within proceeding.

Defendants' argument runs thus: The defendant Union is affiliated with the International Brotherhood of Teamsters, Chauffeurs and Warehousemen. Both the defendant Union and other unions affiliated with the International Brotherhood, have peddler members. Since neither the International Brotherhood nor its other affiliated unions are parties to this action, a decree of this court ordering the ouster of grease peddlers from the defendant Union would violate due process by abrogating the contracts between the absent unions and their peddler members.

█ To state this argument is to refute it: for how can a decree ordering the defendant Union to expel its grease peddler members possibly affect the contracts between other unions in the International Brotherhood and their peddler members?

In support of their contention, defendants cite Consolidated Edison Co. of New York v. N. L. R. B., 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 and N. L. R. B. v. Sterling Electric Motors, 9 Cir., 1940, 112 F.2d 63. In both of these cases the issue under consideration was whether the National Labor Relations Board had jurisdiction to enter orders affecting vital rights of union members without first giving the union notice or an opportunity to be heard.

This issue is not pertinent in the instant case: for here, the decree terminating the peddlers' membership in the Union would be rendered by a court of the United States and not by an administrative agency, such as the National Labor Relations Board. Furthermore, such a decree would be rendered only after having given the interested parties (Local Union 626, including its grease peddler members) a full hearing. Surely it cannot be seriously contended that the International Brotherhood and its other affiliated unions are "interested parties" to a decree which would terminate only the membership of grease peddlers in Local 626, and would in nowise affect the membership of other peddlers in Local 626, or of grease peddlers or any species of peddlers in any other union affiliated with the International Brotherhood.

The mandatory injunction sought by plaintiff would embody a provision that the Union be ordered to terminate the membership of peddlers in said Union and be perpetually enjoined from accepting peddlers as members thereof, unless they become bona fide employees.

Defendants argue that such a mandatory provision is too vague and broad because it would expel from defendant Union not only the 30 or 40 grease peddler members, but in addition all of the Union's 500 or 600 peddler members.

The term "peddlers" as used throughout this action is defined by sub-paragraph 15, Paragraph IV of the complaint (page 3) as "persons who are self-employed entrepreneurs engaged in the business of buying and selling restaurant grease for their own account from restaurants, hotels, and institutions, transporting said grease in trucks owned or operated by themselves to the plants of processors, and selling such restaurant grease to said processors."

Such a definition certainly excludes all peddler members of defendant Union who deal in any commodity other than waste restaurant grease. Therefore, a decree compelling defendant Union to oust peddlers from its ranks would not be too vague or too broad because it would not affect the membership of any but the *grease* peddlers, whose activities as Union members are stipulated to have contributed to the violation of Section 1 of the Sherman Act.

However, any remaining doubt as to which Union members would be reached by the mandatory injunction, would be quickly dispelled simply by inserting the adjective "grease" before the noun "peddlers" in the final form of the injunction.

Defendants next argue that the proposed mandatory injunction is punitive because the expulsion of grease peddlers from defendant Union is not necessary in order to insure against possible future violations of the Sherman Act by defendants.

In antitrust cases, it is the duty of the court to frame its decree so as to suppress the unlawful practices and to take such reasonable measures as will preclude their revival. United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852.

Accordingly, in recent years the Supreme Court has, upon at least three occasions, approved antitrust decrees providing for dissolution or divestiture in order to put an end to combinations whose activities violated the Sherman Act. International Boxing Club of New York, Inc. v. United States, 1959, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270; Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160.

In International Boxing Club v. United States, supra, the District Court, 150 F. Supp. 397, found, as the Government had charged, that defendants had violated §§ 1 and 2 of the Sherman Act by conspiring to restrain interstate trade and commerce in, and by monopolizing, the promotion, broadcasting and televising of world championship boxing contests. After further hearings on the nature and extent of the relief necessary to protect the public interest, the District Court entered a final judgment dissolving the international boxing clubs, directing the individual defendants to divest themselves of their stock in Madison Square Garden, and granting injunctive relief designed to open up the market in the business of promoting professional world championship boxing matches.

The Supreme Court affirmed the judgment, holding that the relief granted was not beyond the allowable discretion of the District Court.

In United States v. Crescent Amusement Co., supra the United States brought civil suit against nine affiliated companies operating motion picture theaters throughout five States, and against eight major distributors of motion pictures, charging them with conspiracy to restrain interstate trade and commerce in motion picture films and to monopolize the exhibition of films in violation of §§ 1 and 2 of the Sherman Act. The District Court found that certain of the defendants had violated the Act, and entered a decree which required, among other things, that the corporate exhibi-

tors divest themselves of ownership of stock or any other interest in any other corporate defendant, and that certain corporate officers resign from their positions. The Supreme Court affirmed the divestiture and resignation provisions of the decree.

In the instant case, the stipulated facts clearly show that before the grease peddlers joined the defendant Union, there was no suppression of competition among them, and that only the support of the Union and the powerful weapons at its command enabled the peddlers and the Union together to destroy free competition in the purchase and sale of waste grease, and to drive several processors out of business.

As long as this association of the peddlers and the Union continues, there is danger that their combined activities will be revived and that further suppression of competition in the yellow grease industry will result. To borrow the language of the Supreme Court in the Crescent Amusement Co. case, supra, "The proclivity in the past to use that affiliation for an unlawful end warrants effective assurance that no such opportunity will be available in the future." [323 U.S. 173, 65 S.Ct. 262.]

■ Therefore, far from being punitive, a decree terminating the membership of the grease peddlers in defendant Union appears to be the most effective, if not the only, means of preventing a recurrence of defendants' unlawful activities.

The decree shall include a provision ordering defendant Union to terminate the membership of its grease peddler members, and perpetually enjoining the Union from accepting grease peddlers as members unless they become bona fide employees. It shall also enjoin the peddler defendants from holding membership in and participating in the affairs of the Union, unless they become bona fide employees.

Counsel for plaintiffs is directed to prepare, serve and lodge findings and judgment in accordance with local rule 7, West's Ann.Code.