## LOS ANGELES MEAT & PROVISION DRIVERS UNION ET AL. *v.* UNITED STATES.

No. 38. Argued October 10, 1962.—Decided November 19, 1962.

*Charles K. Hackler* argued the cause for appellants. With him on the briefs was *David Previant*.

*Robert B. Hummel* argued the cause for the United States. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Loevinger, Stephen J. Pollak* and *Richard A. Solomon*.

MR. JUSTICE STEWART delivered the opinion of· the Court.

The appellants are a Los Angeles labor union, one of its business agents, and four self-employed independent contractors, so-called "grease peddlers," who were members of the union. They appeal from a judgment entered against them by a Federal District Court in a civil action brought by the United States to terminate violations of § 1 of the Sherman Act.[1] The judgment was entered upon findings based upon a detailed stipulation of facts in which the appellants admitted all the allegations of the complaint and agreed to the ultimate conclusion that they

---

[1] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 15 U. S. C. § 1.

had unlawfully combined and conspired in unreasonable restraint of foreign trade and commerce in yellow grease. In the stipulation the appellants also agreed to the issuance of a broad injunction against them. The District Court's decree enjoined in specific detail the practices found to be unlawful, and in addition ordered the union to terminate the union membership of all self-employed grease peddlers. 196 F. Supp. 12. The appellants attack the judgment here upon the single ground that the District Court was in error in ordering termination of the union membership of these independent businessmen.[2] Consideration of this claim requires a somewhat detailed review of the nature of the illegal conspiracy in which the appellants in this case were concededly engaged.

During the period between 1954 and 1959 there were in Los Angeles County eight firms engaged as processors in the production of yellow grease, an inedible grease produced by removing moisture and solid impurities from so-called restaurant grease—waste grease resulting from the preparation of food in restaurants, hotels and institutions. A substantial part of the yellow grease so produced was sold to overseas purchasers and to purchasers in California for prompt shipment overseas.

The processors procured restaurant grease in two separate ways. They made direct purchases, usually from large restaurants, hotels and other institutions, and in these transactions the processors picked up the restaurant grease from the sellers through employees who were members of the union. Restaurant grease from other sources was usually purchased by the processors from grease peddlers, independent entrepreneurs whose earnings as middlemen consisted of the difference between the price at which they bought the restaurant grease from various sources and the price at which they sold it to the proces-

---

[2] The appeal was brought directly to this Court under the provisions of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29.

sors, less the cost of operating and maintaining their trucks. There were some 35 to 45 grease peddlers in the Los Angeles area.

In 1954 most of the grease peddlers became members of the appellant union, at the instigation of the appellant business agent, for the purpose of increasing the margin between the prices they paid for grease and the prices at which they sold it to the processors. To accomplish this purpose, fixed purchase and sale prices were agreed upon and enforced by union agents through the exercise or threatened exercise of union economic power in the form of strikes and boycotts against processors who indicated any inclination to deal with grease peddlers who were not union members. The union's business agent allocated accounts and territories for both purchases and sales among the various grease peddlers, who agreed to refrain from buying from or soliciting the customers of other peddlers, and violations of this agreement could result in a grease peddler's suspension from the union, in which event he was, of course, prohibited from carrying on his business.

From 1954 to 1959 this basic plan of price fixing and allocation of business was effectively carried out by elimination of the few peddlers who had not joined the union, and by coercion upon the processors through threats of "union trouble" if they did not comply.

Within the union the grease peddlers were treated as a separate group, distinct from the some 2,400 employee members. The meetings of the grease peddlers were always held apart from regular union meetings, and from 1955 on, the grease peddlers were members of a special "subdivision" of the union—Local 626–B. The affairs of this separate subdivision were administered not by regular union officers, but by the appellant business agent who had originated the scheme, together with a committee of grease peddlers to assist in "policing, enforcing

and carrying out the program to suppress and eliminate competition."

There was no showing of any actual or potential wage or job competition, or of any other economic interrelationship, between the grease peddlers and the other members of the union. It was stipulated that no processors had ever substituted peddlers for employee-drivers in acquiring restaurant grease, or had ever threatened to do so. The stipulation made clear that the peddlers and the processors had essentially different sources of supply and different classes of customers. Based on these stipulated facts, the District Court affirmatively found that "there is no competition between [the employee and peddler] groups because each is engaged in a different line of work . . . ."

Pointing out that "the stipulated facts clearly show that before the grease peddlers joined the defendant Union, there was no suppression of competition among them, and that only the support of the Union and the powerful weapons at its command enabled the peddlers and the Union together to destroy free competition in the purchase and sale of waste grease," the District Court concluded that "a decree terminating the membership of the grease peddlers in defendant Union appears to be the most effective, if not the only, means of preventing a recurrence of defendants' unlawful activities." The court further concluded that nothing in the Clayton Act or the Norris-LaGuardia Act prevented the issuance of a decree divesting the grease peddlers of union membership in the circumstances of this case. We agree with these basic conclusions.

It is beyond question that a court of equity has power in appropriate circumstances to order the dissolution of an association of businessmen, when the association and its members have conspired among themselves or with others to violate the antitrust laws. *Hartford-Empire Co.* v.

*United States*, 323 U. S. 386, 428. And the circumstances stipulated and found in the present case provided ample support, we think, for a decree of dissolution, as a matter of the discreet exercise of equitable power.

It is also beyond question that nothing in the anti-injunction provisions of the Norris-LaGuardia Act,[3]

---

[3] Norris-LaGuardia Act, § 4, 29 U. S. C. § 104:

"104. *Enumeration of specific acts not subject to restraining orders or injunctions.*

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

"(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title." March 23, 1932, c. 90, § 4, 47 Stat. 70.

nor in the labor exemption provisions of the Clayton Act,[4] insulates a combination in illegal restraint of trade between businessmen and a labor union from the sanctions of the antitrust laws. *Allen Bradley Co.* v. *Local*

---

[4] Clayton Act, §§ 6 and 20, 15 U. S. C. § 17, and 29 U. S. C. § 52:

"17. *Antitrust laws not applicable to labor organizations.*

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." Oct. 15, 1914, c. 323, § 6, 38 Stat. 731.

"52. *Statutory restriction of injunctive relief.*

"No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful

*Union No. 3,* 325 U. S. 797. Indeed, the appellants have conceded the propriety of the order in the present case which broadly enjoins the illegal practices in which they were engaged.

The narrow question which emerges in this case, therefore, is whether businessmen who combine in an association which would otherwise be properly subject to dissolution under the antitrust laws can immunize themselves from that sanction by the simple expedient of calling themselves "Local 626–B" of a labor union.[5] We think there is nothing in the Norris-LaGuardia Act nor in the Clayton Act, nor in the federal policy which these statutes reflect, to prevent a court from dissolving the ties which bound these businessmen together, and which bound them to the appellant union, in the circumstances of the present case.

---

manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States." Oct. 15, 1914, c. 323, § 20, 38 Stat. 738.

[5] The appellants also urge that the decree violates their right of freedom of association guaranteed by the First Amendment. This contention, carried to its logical conclusion, would render unconstitutional not only many of the provisions of the antitrust laws, but all general criminal conspiracy statutes as well. Such a claim was explicitly rejected in *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490.

The appellants further contend that the decree is void as to grease peddlers who were not joined as defendants. But the order of divestiture ran only against the union:

"The defendant Local 626 is ordered and directed:

"(a) To expel promptly from membership all grease peddlers;

"(b) To refuse membership at any time in the future to any grease peddler;

"(c) To expel from membership any member who becomes a grease peddler;

"(d) To furnish a copy of this decree to all grease peddlers who are now members of Local 626."

The provisions of the Norris-LaGuardia Act place severe limitations upon the issuance of an injunction by a federal court in "any case involving or growing out of any labor dispute," and the statute specifically forbids a District Court in such a case to prohibit anyone from "[b]ecoming or remaining a member of any labor organization." But, as the District Court correctly found, the present case was not one "involving or growing out of any labor dispute," but one involving an illegal combination between businessmen and a union to restrain commerce. In such a case, as *Allen Bradley Co.* clearly held, neither the Norris-LaGuardia Act nor the labor exemption provisions of the Clayton Act are applicable.

This Court's decision in *Columbia River Co.* v. *Hinton,* 315 U. S. 143, is very much in point. That was a private antitrust suit brought by a processor of fish to enjoin an allegedly illegal combination of fishermen, who had joined together in the Pacific Coast Fishermen's Union to regulate the terms under which fish would be sold. The organization was "affiliated with the C. I. O." 315 U. S., at 144. The defendants claimed that an injunction against them would violate the Norris-LaGuardia Act. The Court held that the controversy was not a "labor dispute" within the meaning of the Norris-LaGuardia Act, pointing out that that statute was "not intended to have application to disputes over the sale of commodities." 315 U. S., at 145. Here, as in *Columbia River Co.,* the grease peddlers were sellers of commodities, who became "members" of the union only for the purpose of bringing union power to bear in the successful enforcement of the illegal combination in restraint of the traffic in yellow grease.[6]

---

[6] In November 1954, the grease peddlers formed a trade association known as the Los Angeles Grease Buyers Association. This association was unsuccessful in its efforts to control the market in restaurant grease, and it was dissolved in early 1955 after a meeting at which

The District Court was not in error in ordering the complete termination of that illegal combination.

What has been said is not remotely to suggest that a labor organization might not often have a legitimate interest in soliciting self-employed entrepreneurs as members. Cf. *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products,* 311 U. S. 91; *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769; *Local 24* v. *Oliver,* 358 U. S. 283. And both the Norris-LaGuardia Act and the Clayton Act ensure that the antitrust laws cannot be used as a vehicle to stifle legitimate labor union activities. But here the court found upon stipulated facts that there was no job or wage competition or economic interrelationship of any kind between the grease peddlers and other members of the appellant union. If that situation should change in the future, the District Court will have ample power to amend its decree.[7]

*Affirmed.*

MR. JUSTICE GOLDBERG, with whom MR. JUSTICE BRENNAN joins, concurring.

I concur in today's opinion and judgment of the Court because the absence here of any countervailing union interest in retaining the grease peddlers as members coupled with the egregious nature of the conduct involved supports the District Court's exercise of discretion in imposing the contested sanction as the "most effective . . . means of preventing a recurrence of defendants' unlawful activities." *Ante,* p. 98. As I read the stipulated record, the peddlers did not act and were not viewed by the

the appellant union business agent told the peddlers to choose between the union and the association, stating that the union could do for the peddlers what the association could not do.

[7] *United States* v. *Swift & Co.,* 286 U. S. 106, 114. Cf. *Donaldson* v. *Read Magazine,* 333 U. S. 178, 184.

union as participants in normal union activities designed to better their economic condition, but instead were from the very beginning used by union officials to effect a concededly illegal scheme to control the distribution and processing of grease.

This does not mean, and I do not regard the opinion of the Court as saying, that members may be expelled from a union when the pursuit of genuine labor objectives has collaterally resulted in transgressions of the antitrust laws.

The relief given by the District Court is not inconsistent with these expressions. To support its order, however, that the union must terminate the membership of the grease peddlers, the court below reasoned that the expulsion was appropriate and justified because, in the absence of job or wage competition between the peddlers and other union members, the peddlers were not proper subjects of unionization. In reaching this conclusion, the court below too narrowly circumscribed the permissible area of legitimate labor union activity. To believe that labor union interests may not properly extend beyond mere direct job and wage competition is to ignore not only economic and social realities so obvious as not to need mention, but also the graphic lessons of American labor union history.

Today's opinion of the Court thus properly notes that a labor organization may "often have a legitimate interest in soliciting self-employed entrepreneurs as members" and recognizes that permissible union interest and action extends beyond job and wage competition to other "economic interrelationship[s]." *Ante,* p. 103. In my view, there is therefore implicit in this Court's opinion a rejection of the District Court's overly strict view that job or wage competition is the sole measure of the propriety of union organizational efforts.

Notwithstanding what I take to be its disapproval of the views of the district judge, the Court correctly sustains

the judgment expelling the peddlers from membership in the union, not because there is absent the job or wage competition erroneously considered crucial by the District Court, but because there does not appear in this record any other legitimate labor union interest presently being served by organization of these peddlers.

The Court is not here required to pass upon, and does not pass upon, the existence of the antitrust violation, or whether, as an original matter, the grease peddlers might properly associate among themselves or affiliate with a sympathetic and genuinely interested union to improve their economic condition. Resolution of such issues would require careful and detailed consideration of federal labor policy, the scope of the antitrust exemption afforded labor organizations by §§ 6 and 20 of the Clayton Act and the Norris-LaGuardia Act, as interpreted by *United States* v. *Hutcheson,* 312 U. S. 219, and, in addition, the applicability here of the doctrines enunciated by this Court in cases such as *Columbia River Packers Association, Inc.,* v. *Hinton,* 315 U. S. 143, and *Allen Bradley Co.* v. *Local No. 3,* 325 U. S. 797. In the present case, however, appellants stipulated in the District Court that they have violated the Sherman Act and engaged in a pattern of conduct calling for remedial injunctive relief; they offered no justification for their admittedly illegal conduct. These concessions necessarily forfeit any antitrust exemption which might otherwise have been claimed to attach. Consequently, the only question remaining is whether, having thus negatived by their stipulations the existence of any exonerating legitimate union interest, appellants may now complain that the district judge abused his discretion in fashioning a remedy which included, in addition to the enjoining of future similarly illegal conduct, expulsion of the peddlers from the union. Although, as I have indicated, I do not agree with all of

his views, I believe that the district judge did not exceed permissible bounds in framing the decree.

The particular nature of the challenged conduct giving rise to the ultimate illegality (whether adjudicated after contest or stipulated) is, of course, immediately and directly relevant to the nature of the relief to be decreed. Relief should be effective to preclude future violations and, at the same time, should not unduly penalize the parties. Since · the conduct here goes beyond that recorded in the opinion of the Court, a brief recital of additional facts is appropriate.

The stipulated antitrust violation does not depend upon the fact of combination between the grease peddlers and the union for the purpose of bettering the economic condition of the former through limited use of collective bargaining power—an affiliation which standing alone and as an original matter might have been proper. Though not joined as defendants below, at least some of the processors purchasing grease from the peddlers were conceded to have been co-conspirators. The union business agent openly allocated sales among the processors and certain processors were completely cut off from sources of supply. On at least one occasion, processors were required to submit information concerning the volume of their grease purchases and the data supplied was used by the union as a basis for ordering an equalizing shift of business to a processor owned by a union member. Only a month earlier, the union business agent had arranged for a competitor to "help out" this same favored processor by selling for it grease which it was having trouble selling. The accommodating processor undertook the sale simply because it feared "trouble" with the union and its agent if it refused.

By virtue of the union's activities, the peddlers' sales of grease were ultimately wholly diverted from the six processors originally dealing with the peddlers to two

processors, one of which was owned by a union member and in the other of which a union member was a partner. In the course of accomplishing this shift of business, at least one noncooperative processor was forced out of business.[1]

Such facts—all of which were stipulated—demonstrate a pattern of allocation of sales among processors and other improper practices designed to benefit certain favored processors in which union members had a direct financial interest.

Moreover, as indicated in the opinion of the Court, appellants stipulated that the peddlers themselves are "independent businessmen" and not "employees" of the processors. We cannot overlook the force of these concessions. This case is unlike *Labor Board* v. *Hearst Publications,* 322 U. S. 111, in which nonemployee status was not merely unconceded, but the contrary was argued and shown. Here, the single paragraph in the stipulation of facts describing the nature of the peddlers' activities does not overcome the ultimate stipulation that they were "businessmen" and not "employees." Certainly we should not, merely by mechanically affixing naked labels imported from other contexts, decide cases on abstractions; but we cannot ignore the impact of unlimited, self-made categorizations applied by agreement in the very lawsuit before us.[2]

---

[1] The union agent told the owner of the business that "if he [the agent] could learn the name of [the processor's] . . . landlord and the buyers to whom [the processor] . . . was selling yellow grease . . . he would bring pressure through the Union to have [the processor's] . . . lease cancelled and to have the buyers stop dealing with [it] . . . ." The agent said that he did not "want [the processor] . . . in the grease business."

[2] The stipulation of nonemployee status plus the absence of pursuit of any genuine labor objective negatives the existence of any "labor dispute" and eliminates the need to consider further the applicability

The import of the entire stipulated factual record is that the union neither had nor pursued any legitimate present interest in organizing the grease peddlers. Were it otherwise, that portion of the decree compelling expulsion of the peddlers from the union, in my view, could not stand. The sanction here invoked is an extreme one, and, unless confined to use but rarely and then only in the most compelling of circumstances, may become a device for unfairly and improperly fractionalizing or decimating unions.

On the circumstances presented to the Court, the judgment below is properly affirmed. The situation may change, however, and I understand the opinion of the Court to say that if a legitimate union interest in organizing the peddlers does hereafter arise, the District Court has the power, and indeed the duty, to modify the decree on application of the appellants. For these reasons, I join in the opinion of the Court.

MR. JUSTICE DOUGLAS, dissenting.

If we took here the approach we took in *Labor Board* v. *Hearst Publications,* 322 U. S. 111, we would reverse this judgment. The question there was whether "newsboys," (who were indeed mature men, *id.,* 116) whose compensation consisted of the difference between the price at which they bought their papers from the publisher and the price at which they sold them, were "employees" for purposes of the National Labor Relations Act. Though

---

of the Norris-LaGuardia Act prohibitions on specified injunctive relief. There is involved neither an extension of *Allen Bradley Co.* v. *Local No. 3,* 325 U. S. 797, nor a narrowing of the application of Norris-LaGuardia. Similarly obviated is the related question whether the substantive antitrust exemption read into the Norris-LaGuardia Act by *United States* v. *Hutcheson,* 312 U. S. 219, is coextensive with the Act's injunctive inhibitions, so that appellants' waiver of the former with respect to the activities and combination here challenged, see p. 105, *supra,* is also effective to waive the latter.

by common-law standards they were "independent contractors," we held that they were "employees" under the Federal Act. We noted that numerous types of "independent contractors" had formed or joined unions for collective bargaining—musicians, actors, writers, artists, architects, engineers, and insurance agents. *Id.*, 127, n. 26. We pointed out that there were marginal groups who, though entrepreneurial in form, lacked the bargaining power necessary to obtain decent compensation, decent hours, and decent working conditions. *Id.*, 126–128. We emphasized that "the economic facts of the relation" (*id.*, 128) may make it "more nearly one of employment than of independent business enterprise with respect to the ends sought to be accomplished by the legislation." *Ibid.*

We know from our own cases (which are much closer on their facts to the present controversy than is *Columbia River Co.* v. *Hinton,* 315 U. S. 143) that the owner-driver-peddler system in the transportation and service trades has led to wage and job competition and to strife of one kind or another. *Senn* v. *Tile Layers Union,* 301 U. S. 468, sustained picketing of a tile contractor who did much of the manual labor himself but also hired a few nonunion helpers. In *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, a conflict arose between a union and small peddlers of baked goods who had increased ranks as a result of social security and unemployment compensation laws. *Id.*, 770. We sustained under the First Amendment the union's picketing of the peddlers. See also *Local 24* v. *Oliver,* 358 U. S. 283.

*Drivers' Union* v. *Lake Valley Co.,* 311 U. S. 91, is even more in point for it presented, as does the present case, a question under the Norris-LaGuardia Act. Small milk peddlers who bought from wholesalers and sold to retailers grew so fast that union dairy employees lost their jobs and retailers started cutting prices. The result was a

weakening of the union position. Picketing started and an injunction against it issued. We held that there was a "labor dispute" within the meaning of the Norris-LaGuardia Act and therefore that the federal courts had no power to issue an injunction. Cf. *United States* v. *American Federation of Musicians,* 318 U. S. 741.

It was stipulated in the present case that "Grease peddlers are independent businessmen who are engaged in the business of buying, transporting, and selling restaurant grease for their own account. They are not employees of the grease processors."

This is the beginning not the end of the problem. And it is no answer to say, as did the District Court, that union members and these grease peddlers do not compete. That is, indeed, denied by the record *which shows that union members drive trucks for grease producers and pick up and transport grease.*

The record in *American Trucking Assns.* v. *United States,* 344 U. S. 298, 304–306, makes clear that marginal owner-drivers can demoralize large segments of the transportation industry. Moreover, the stark fact is that here, as in the "newsboys" case, the union's effort was to improve the economic status of the grease peddlers. This is made clear by the stipulated facts:

> "These self-employed peddlers have no established places of business; no employees, except an occasional loader; no capital investment except a small equity in a truck; no skill or special qualifications except the ability to load, unload and drive a truck. . . . Their earnings represent the difference between the buy and sell price of the waste grease . . . ."

When the level of prices paid to peddlers by processors dropped in 1952–1954 to less than half of the previous price, the income of peddlers was substantially reduced.

This led to intensive competition between peddlers. As a result, the unionization program was designed to increase the profits of the grease peddlers by allocating routes and customers between them and by increasing the margin between the price paid by the peddlers and the price they would receive.

The Court said many years before this age of enlightenment that unions were rightfully concerned with "the standard of wages of their trade in the neighborhood." *American Foundries* v. *Tri-City Council,* 257 U. S. 184, 209. This fact underlies the present controversy. All who haul grease, whether "employees" or "peddlers," are in the same boat. Protection of one protects all. The union plainly has a legitimate interest in the conditions in the industry which increase or reduce employment opportunities or increase or reduce labor's rewards.* The

---

*"The small owner-operator or 'gypsy' needs only enough capital to make a down payment on a truck and is free to offer his services at whatever rates he may be willing to accept. In order to protect his equity in his truck he tends, under competitive pressures, to progressively lower his rates until he is taking a bare subsistence for his own wages and is providing inadequate reserves for repairs, maintenance, or replacement. He works long hours, attempts to do his own repair work, often disregards health and safety requirements and load restrictions. He is difficult to organize into trade associations for purposes of self-regulation of rates and standards; and he is likewise difficult to organize into a trade union. He often loses his truck through inability to maintain payments; or when it wears out he has no funds accumulated for another. But there are always new hopefuls to replace him, especially in a period of considerable unemployment (as in the thirties), when an attempt to create self-employment appears to be the only alternative to no employment whatever. Unless regulated in some manner, the small owner-operator constitutes a menace to employment conditions, standards, and in fact to the stability of the entire industry." Gillingham, The Teamsters Union on the West Coast, Institute of Industrial Relations, U. of Calif. (1956), pp. 35–36.

fact that illegal acts were committed does not alter the fact that at heart we have here a "labor dispute" within the meaning of the Norris-LaGuardia Act. That definition is broad and includes "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." 29 U. S. C. § 113 (c). To the extent that the stipulations in this case tend to preclude the conclusion that there was a "labor dispute" those stipulations should not control. For other stipulations of fact compel the contrary conclusion, which is essentially a legal question. *Estate of Sanford* v. *Commissioner,* 308 U. S. 39. "We are not bound to accept, as controlling, stipulations as to questions of law." *Id.,* 51.

The fact that acts were committed which overstepped the bounds set by the interlacing Sherman, Clayton and Norris-LaGuardia Acts means that the full array of antitrust remedies can be brought against the grease peddlers, insofar as they combined with processors, a nonlabor group. See *Allen Bradley Co.* v. *Local Union,* 325 U. S. 797, 812. Yet that does not mean that they can be expelled from the union. Since there was a "labor dispute" within the meaning of the Norris-LaGuardia Act, federal courts have no power to compel the grease peddlers to resign as members of the union. For that Act expressly bars a federal court from enjoining anyone from "Becoming or remaining a member of any labor organization." 29 U. S. C. § 104 (b).

The fact that the grease peddlers may have committed federal offenses or otherwise shown themselves to be lawless, not law-abiding, in no way qualifies the absolute command of the Norris-LaGuardia Act. Indeed, we held in *Allen Bradley Co.* v. *Local Union, supra,* 812, that a

union that combines with business interests to violate the antitrust laws could be enjoined only as respects "those prohibited activities." Otherwise we said the injunction would run "directly counter" to the Norris-LaGuardia Act. *Id.*, 812. When we sanction the addition of the penalty of expulsion from union membership, we qualify the *Allen Bradley* decision.