W. E. ANDERSON SONS COMPANY, Plaintiff-Appellee, v. LOCAL UNION NO. 311, INTERNATIONAL BROTHERHOOD OF TEAMSTERS et, Defendants, LOCAL UNION NO. 311 et, Defendants-Appellants.

Ohio Appeals, Second District, Franklin County.

No. 4362. Decided May 1, 1950.

Vorys, Sater, Seymour & Pease, Carl Tangeman, of Counsel, Columbus, for plaintiff-appellee.

Robert C. Knee, Fred M. Kerr, Dayton, for defendants-appellants.

## OPINION

By THE COURT.

This is an appeal on questions of law and fact from an injunctive order against defendants-appellants. The form of the appeal requires that we consider and determine the issues as though the case originated in this Court.

Plaintiff corporation was engaged in the business of transporting material and merchandise and at the times involved in this suit was delivering gravel and dirt to the site of the Tuberculosis Hospital Health Center Building then being constructed at the Ohio State University. Plaintiff had a contract with H. W. Holt and Son Co., a subcontractor of the James I. Barnes Construction Company, general contractor on the project. Plaintiff did not employ union labor in its business and was moving its material, under its contract to the site of the building under construction with nonunion men.

Defendant-appellant, Don Pfeiffer, was the business agent of Local Union No. 311, Brotherhood of Teamsters, etc., who, for its Local attempted to secure the job which was given to the employees of plaintiff. Phil O'Day, defendant at the time the controversy arose, was president and a member of Columbus Building Trade Council made up of delegates of each of the defendant Local Unions and of numerous other Local Unions connected with the Building Trades and authorized by the Department of the American Federation of Labor.

It is not necessary to set out the names, offices and relation to the controversy of the other named defendants because no order was directed to them and there is no contention by either party on this appeal that we should hold differently than the Common Pleas Court respecting them.

The facts, as developed, are that in February, 1949, the Holt Company, the exacavating subcontractor, was under pressure to deliver gravel and dirt to the building under construction by the Barnes Company. Mr. Tom Holt of the Holt Construction Company contacted Mr. Pfeiffer and Mr. O'Day for the purpose of securing union haulers of the material to be removed. On February 4, they agreed to supply union drivers with dump trucks on the Monday following. Holt, in conversation with Pfeiffer, discussed the necessity of the truckers having P. U. C. O. permits inasmuch as the material

was to be moved from a place outside of the city limits of Columbus. The union haulers had no such permits. Some controversy later arose over this situation which controversy has no weight except as it may throw some light on the feeling that may have been engendered between Anderson and Holt, on the one side, and Pfeiffer and O'Day on the other, which might become material if, and when, a combination was shown to exist between Pfeiffer and O'Day representing their respective organizations.

On February 9 the Anderson trucks began to haul material and soon thereafter a banner, with a picket, was placed at the corner of Tenth and Perry Streets, the entrance to the construction project. The banner read: "Anderson does not employ members of Teamsters Local 311, affiliated with the Building Trades Council, A. F. L." Succeeding the placing of the banner, and the picket, most of the union men employed on the project by the Barnes Company, or its subcontractors, left the job, as a result of which Anderson's men were ordered withdrawn. Union men, members of Teamsters Local 311, were then employed to do the hauling, returned to the job and had worked but a few hours when an official from the Public Utilities Commission of Ohio came onto the job and stopped operations because the men did not have P. U. C. O. licenses.

As a result of this stoppage, a hearing was had before the Public Utilities Commission during which it developed that Holt was a holder of a P. U. C. O. license but that he would not permit the union haulers to operate under it for reasons satisfactory to him. There is the implication that Holt, by his attitude, was favoring Anderson and that he had misled Pfeiffer and O'Day as to his ownership of the certificate. He makes explanation of his statements and conduct respecting this license. Suffice to say that he was under no legal obligation to permit the union haulers to operate under his license.

The union men being unable to continue their hauling, Anderson was again employed and resumed operations whereupon there was a repetition of occurrenses such as had attended his first attempt to carry out his contract. The banner went up again, the picket took up his station, most of the union men on the job left their work. Anderson's men hauled for some time, when the principal contractor wired him to cease hauling. This was the situation when the petition was filed.

Plaintiff's petition is based upon the claim that the defendants, by combination in restraint of trade in violation of the Valentine Act, §§6391 et seq, GC, by placing of the banner, the picketing of the site and the conduct and state-

ments of the defendants, caused all members of the defendants' union working on the site for the Barnes Construction Company and Raymond Concrete Pile Company to cease work on said site for their respective employers and thereby coerced and forced said employers to refuse to permit the plaintiff to deliver dirt and bank run gravel to said site, and that the purpose of said defendants was to bring about the result accomplished.

The order directed to defendants, Labor Union No. 311, Don Pfeiffer, individually and as business agent of said union, Columbus Building Trades Council, and Phil O'Day, individually and as an officer of Columbus Building Trades Council, enjoins them from,

a. Picketing or bannering the site of any building, job or work where plaintiff has or shall have delivered building materials or other commodities, including dirt and bank run gravel, for the purpose of preventing plaintiff from making delivery of materials or other commodities to such site.

b. Instructing, advising or persuading, or attempting to instruct, advise or persuade any member of any of the defendant unions or others to cease working or to threaten to cease working for the purpose of preventing plaintiff from making delivery of materials or other commodities, including dirt and bank run gravel.

c. Interfering or attempting to interfere with or molest the business of any person, firm or corporation to whom plaintiff may deliver materials or other commodities, or the customers of plaintiff, or the customers, employees, agents or other persons with whom plaintiff has dealings for the purpose of preventing plaintiff from making delivery of materials or other commodities to any person, firm or corporation.

The foregoing order, in so far as picketing or bannering is concerned, is intended to be only a limitation on picketing or bannering for the specific purposes indicated in Paragraphs a, b and c, and it shall not be construed in any manner to prevent peaceful picketing or bannering, for any other purpose or at any other places than those mentioned in Paragraph a nor for any purpose not set forth in Paragraphs a, b and c.

As we interpret this order, its practical effect, in part, is to preclude the placing of the banner of Labor Union No. 311 at the site of the building project to which place materials were being hauled by that Local. The order is qualified by providing that the site shall not be picketed or bannered "for the purpose of preventing plaintiff from making delivery of materials or other commodities to such site," but this qualifica-

tion saves no right to the defendant Local to picket or banner because the judgment finds that the primary purpose of the picketing was to prevent the plaintiff from delivering material to the job site. The order also limits its effect to picketing or bannering for the specific purposes recited and provides that it shall not be construed in any manner to prevent peaceful picketing or bannering, for any other purpose or at any other places than those mentioned in paragraph A, nor for any purpose not set forth in paragraphs a, b and c.

We are unable to find that any right is left to the defendant, Local Union No. 311, by the language of the order to place a picket or a banner such as the one under consideration in this case, unless it might be that such a banner could be placed at some other location than the site of the Barnes Construction project.

In the oral presentation of this appeal, it was urged that the banner should not be permitted at the site where placed but that it might not be objectionable if placed in front of the business office of the plaintiff. We find no merit in this contention. If the Local No. 311 had any right to place the banner, it was appropriate that it do so at the site of the project to which plaintiff's trucks were moving in the transportation and unloading of the materials delivered to the site.

Coming to the decisive questions in this case, we shall assume, for the purpose of this opinion, that the petition states a cause of action and if its averments are established the plaintiff is entitled to injunctive relief.

There are several questions for determination, one is whether or not under the circumstances developed the defendant Local No. 311 had the right to place the banner and picket the site of the Barnes Company construction project. Second, were the other defendants enjoined parties in combination with Local 311 in placing the banner? Third, did Pfeiffer, as business agent, and O'Day, individually or as president of Columbus Building Trades Council, in combination, use other means than the banner and picket to prevail upon members of other unions who worked on the project to leave their work because of the employment of nonunion men on the Anderson contract? We will not consider these questions in the order stated.

To support a finding of conspiracy on the part of the defendants to commit an unlawful act requires convincing proof and an injunction should not be granted in the absence of such proof. It is said that the injunction in this case requires the observance of no course of conduct other

than that which appellants insist they have at all times observed. Manifestly, if they have not engaged in such conduct as is charged against them by the petition they should not be restrained.

Coming to the second and third propositions, viz.: Were Pfeiffer and O'Day in a combination to place the banner; was their conduct toward the union men on the job intended to and did it cause them to leave their work? O'Day testifies, and it is not disputed, that he had no authority as President of Columbus Building Trades Council to place, cause the placing, remove, or cause the removal of a picket or a banner at the building site. That he was actually engaged in the controversy clearly appears. He was consulted by Holt at the outset of negotiations for the hauling, later by representatives of Barnes Construction Company, and was invited into meetings of the parties interested and took part therein. As a matter of fact, it appears that he attended these meetings on invitation of the contractor or a subcontractor, rather than upon his own initiative. He was present on the job during the difficulties respecting the hauling, but it appears that in the ordinary course of his duties he would have been there had there been no such controversy.

Without attempting to quote all of the statements attributed to O'Day, we are satisfied to say there are but two that could be construed as having for their purpose and effect the removal of the union workmen from the jobs. It is testified, though denied by O'Day, that at the job on February 10th, he walked up to a Labor steward and asked him what he was going to do to which reply was made that he did not know, whereupon O'Day suggested that he go home but that he could not make him go according to law; and the testimony of another witness, representative of Barnes, that O'Day called to inquire if Anderson's men were working and upon being informed that they were said, "Well, if they want a showdown we'll let them have it." If the word "they" was broad enough to include not only the plaintiff and his men but also the contractor, or subcontractor or laborers on the job, the statement constituted a threat of interference which was in the nature of a secondary boycott. But this language is susceptible of and indeed should be given a construction consistent with fair dealing, which would imply that O'Day had in mind Anderson's men and that only such steps would be taken by the union as would be lawful.

This latter statement, imputed to O'Day, is the only evidence in the case which can be found to include even a semblance of a threat to induce the union men to leave the job.

In Maywood Farms Company v. Milk Wagon Drivers' Union, etc., et al., (313 Ill. App. 24), 38 N. E. (2d) 972, the first syllabus holds:

"A 'secondary boycott' exists where evil motive is found accompanied by unlawful acts, and in order to give a court of equity jurisdiction to restrain a secondary boycott, it must contain the elements of coercion, either by threats, intimidation or violence."

The Court cites and relies upon two cases: Milk Wagon Drivers' Union v. Meadowmoor Dairies, Inc., 312 U. S. 287, and American Federation of Labor v. Swing, 312 U. S. 321. We do not rely upon these cases, but test the evidence to find if there was a conspiracy in furtherance of which any coercive acts were committed by the defendants independent of threats, intimidation or violence. In our judgment, no statement or act of O'Day, or Pfeiffer, is found in this record which requires a construction that they were chargeable with any overt conduct unless the picketing was purposed to cause the Union employees to leave their jobs. Upon this issue we cannot find a combination between O'Day and Pfeiffer. It is testified, and not denied, that Pfeiffer alone had the authority to call the men of Local Union No. 311 onto the picket line and to banner the job, and it does not appear that O'Day counselled or advised him to do so. Had he so advised it would not have been tortuous conduct.

It is claimed that there is no controversy between Anderson and his employees, none between Local Union No. 311 and the employers of the union men on the job. This is true. Does this bar the Local No. 311 from picketing the place where Anderson's men were working? It may be said that the picketing of Anderson was the cause of the union men, as individuals, leaving their work because of the unwritten rule which many union men observe, that they will not cross a picket line or work back of a banner. No such unwritten rule is involved here.

We held, in Settos v. International Alliance of Moving Picture Operators (1940), 32 Abs, 219, 43 N. E. (2d) 893, that where there was no labor dispute between the union and the owner of the place picketed an injunction would lie to prevent such picketing. Motion to certify the record in this case was denied in our Supreme Court. However, more recently, (1941) in American Federation of Labor, et al., v. Swing, 312 U. S. 321, 61 S. C. R. 568, third syllabus, it is stated:

"A decree which for purposes of a particular case asserted as the common law of the State of Illinois that there could be no peaceful picketing or peaceful persuasion in relationship to any dispute between an employer and trade union unless the employer's own employees were in controversy with him, was inconsistent with the guarantee of 'freedom of speech' and could not be sustained."

The first question, viz., the right of Local No. 311 to banner and picket the site of the Barnes Company construction project under the circumstances has caused us much concern. That one effect of the placing of the banner was to cause the union men to leave their job is manifest. May a court of equity enjoin the placing of this banner, assuming that the union had the right to picket because of the presence of the nonunion men working for Anderson, by reason of its further effect in drawing the union men off the construction part of the project?

Appellee relies, in part, upon the case of Carpenters' and Joiners' Union, etc. v. Ritter's Cafe, 315 U. S. 722, 62 S. Ct. 807. In the cited case Ritter contracted for the construction of a building a mile and a half away from a restaurant which he operated. The employees were nonunion carpenters and painters and the building to be erected had no connection with the restaurant in which all employees were union members and with whom Ritter had no controversy, nor, had the Carpenters' and Joiners' Union any controversy with Ritter at the restaurant. A picket carrying the following placard was placed in front of the restaurant:

"The owner of this Cafe has awarded a contract to erect a building to W. A. Plaster, who is unfair to the Carpenters Union 213 and Painters Union 130, affiliated with the American Federation of Labor."

The lower courts had found that the Cafe was picketed "for the avowed purpose of forcing and compelling plaintiff (Ritter) to require the contractor, Plaster, to use and employ only members of the defendant unions on the building under construction in the 2800 block on Broadway."

In conjunction with the picketing, the restaurant workers' union called Ritter's employees out on strike and withdrew the Union card from his establishment. Union truck drivers refused to cross the picket line to deliver food and other supplies to the restaurant. A curtailment of sixty per cent of Ritter's business resulted. The lower trial court enjoined the picketing holding that the activities of the unions consti-

tuted a violation of the anti-trust law of the State of Texas. The decree was restricted to the picketing at the Cafe, and did not forbid picketing elsewhere (including the building under construction by Plaster) nor communication of the facts of the dispute by any means other than the picketing of Ritter's restaurant. The question presented to the court was whether or not the anti-trust law of the State of Texas upon which the trial court relied in granting the injunction infringes the freedom of speech guaranteed by the due process clause of the Fourteenth Amendment. We do not see the applicability of the judgment in this case to the facts developed in the instant case. The picketing here was at the place where the work of the employees of the subcontractor, Anderson Company, was being performed. In that particular the decree under review is favorable to the position of the appellant union here, in that, inferentially, at least, it conceded the right of the defendant union to picket the building under construction and to communicate at the site of the job the facts as to the dispute.

Justice Frankkfurter, page 810, 62 S. C. R., in the Ritter case, discussing American Federation of Labor v. Swing, 312 U. S. 321, 326, and Bakery & Pastry Drivers & Helpers Local No. 802 v. Wohl, 315 U. S. 769, said:

"The line drawn by Texas in this case is not the line drawn by New York in the Wohl case. The dispute there related to the conditions under which bakery products were sold and delivered to retailers. The business of the retailers was therefore directly involved in the dispute. In picketing the retail establishments, the union members would only be following the subject-matter of their dispute. Here we have a different situation. The dispute concerns the labor conditions surrounding the construction of a building by a contractor. Texas has deemed it desirable to insulate from the dispute an establishment which industrially has no connection with the dispute. Texas has not attempted to protect other business enterprises of the building contractor, Plaster, who is the petitioners' real adversary."

The Wohl case to which Justice Frankfurter refers, 315 U. S. 769, 62 S. Ct. 816, parallels our facts closely enough to constitute a precedent which we should follow. It was decided on the same day as the Ritter case, supra. In the Wohl case the petitioners were a labor union and certain of its officers, members of which were truck drivers who distributed baked goods. The respondents were Wohl and Platzman who were peddlers of baked goods, and it was developed that there

were many other peddlers operating as did Wohl and Platzman. Neither respondent had any contract with the bakeries from which they bought and had no contracts with their customers. The situation developed by the operation of these peddlers was found to be harmful not only to them but to the union with which it was urged they should be affiliated. The union for their group had a requirement that no member should work more than six days per week. The union attempted but had not succeeded to prevail upon the peddlers to join and upon the final refusal to join the union or to employ a union relief man the union placed pickets in the vicinity of the bakeries which sold products to Wohl and Platzman. Each picket carried a placard, one bearing the name of Wohl, the other that of Platzman, and under each name appeared a statement setting forth the claim of the union. The trial court issued injunctions restraining the union and its officers and agents from picketing, either the places of business or manufacturing bakeries who sell to the respondents or the places of business of their customers which order had been affirmed by two appellate courts. The basis of the decisions in the lower courts was that no trade disputes were involved between the parties within the meaning of the New York statutes. As to this Justice Jackson, writing the opinion in the U. S. Supreme Court, said:

"one need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive."

At page 819, 62 S. Ct., deciding the question he said:

"We ourselves can perceive no substantive evil of such magnitude as to mark a limit to the right of free speech which the petitioners sought to exercise."

The Court held that the injunctions were improperly allowed. Thornhill v. State of Alabama, 310 U. S. 88, 60 S. Ct. 736, involved the constitutionality of an Alabama statute forbidding picketing a place of business of any person for purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another. The petitioner had been convicted of a violation of the statute, heretofore mentioned, upon a charge that without just cause or legal excuse he did "go near to or loiter about the premises of the Brown Wood Preserving Co. with the intent or purpose

of influencing others" to adopt one of an enumerated courses of conduct and he "did picket the works of the Company for the purpose of interfering with or injuring its lawful business." The claim of the petitioner was that the statute deprived him of the right of peaceful assemblage, the right of freedom of speech, and the right to petition for redress. The Court so held and reversed the conviction. The freedom of speech and of the press guaranteed by the Constitution is discussed in the opinion, at page 102, 60 S. Ct.:

"In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution."

It is conceded that the Taft-Hartley Act is not applicable to the facts here but some of the principles involved in its interpretation are relevant especially as relate to secondary boycott which has been projected into the field of interpretation because of that Act. It would serve no good purpose to discuss, at length, the cases that have been adjudicated involving secondary boycott under the above mentioned Act, but one of recent date is interesting because of the similarity, in one aspect, of the facts with those presented here. We refer to International Brotherhood of Electrical Workers, Local 501, et al., v. National Relations Board, No. 102 United States Court of Appeals, Second Circuit, Docket No. 21365, decided February 24, 1950, not yet officially reported.

This was an appeal from an order of the Labor Board enjoining the relator from carrying on what the Board had held to be a secondary boycott. There were two questions presented, the second of which reached the question whether or not the Board was correct in holding that the evidence supported the finding of the Board that the "Local" had engaged in conduct which constituted a secondary boycott. The Court supported the finding of the Board. The facts were that a contractor, Giorgi, had agreed to build a house for the owner of a lot, and let the carpentry to Deltorto and the electrical work to Langer. Giorgi himself did the masonry work. Deltorto had two carpenters on the job, members of a union; Langer, a nonunion employer, had none. Patterson, a business representative of the "Local," told Deltorto and the two carpenters that the job was unfair because the electrical work was being done by nonunion labor and later bannered and picketed the job. The carpenters, upon reading the banner, quit and went home. Patterson then stopped picketing but called Giorgi and told him that he would have to replace Langer with a

union contractor or he could not complete the job. Giorgi told Langer what Patterson had said, whereupon Langer abandoned his contract and quit his work. Shortly thereafter Giorgi told Deltorto what Langer had done and the two carpenters went back to work. Hand, Ch. J., writing the opinion, said:

"The two carpenters quit work because Patterson 'induced' them to do so and quit in 'concert.' * * * Patterson's purpose was to force Giorgi 'to cease doing business with' Langer; it is enough that the purpose was to put pressure on Giorgi through Deltorto and that Giorgi was certainly 'doing business with' Langer. The situation was therefore within par. 8 (b) (4) (A), unless it makes a difference that Giorgi, upon whom the 'concerted refusal' indirectly impinged, was at work on the same job with Langer with whom the union had its dispute. In short, is a secondary boycott limited to pressure upon third parties who are not engaged in the same venture with the unyielding employer? We can see no basis for such a distinction. The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it."

Continuing:

"Certain situations are, however, to be distinguished. The work of the employer may be so enmeshed with that of the third party that it is impossible to picket one without picketing the other. The case at bar might have been of that sort, **had Langer's nonunion employees been at work on the job,** and Patterson's only purpose been to induce them to quit. Apparently it is the opinion of the Board that the Act does not forbid picketing the employer, even though that has the incidental effect of picketing a third person." (Emphasis ours.)

The last sentences quoted are indentical with the situation presented by the facts on this appeal. The picketing was done at the site of the Anderson Company job where the nonunion employees were at work, the same place of operation as the union workers who quit the job. The defendant union had the right to picket where the banner was placed and in so doing the incidental effect was to cause the union employees to quit their work.

We do not find that the plaintiff has established its claim for injunctive relief. It will, therefore, be denied.

MILLER, PJ, HORNBECK and WISEMAN, JJ, concur.