MR. Justice Harlan,
whom Mr. Justice Stewart joins,
dissenting.
The question in this case is whether a union involved in a labor dispute with an employer may lawfully engage in peaceful picketing at the premises of another employer in order to dissuade its customers from purchasing products of the first employer dealt in by the picketed establishment. Such activity, in the parlance of labor law, is known as secondary consumer picketing, the picketed employer being called the “secondary employer” and the other the “primary employer.”
The question is controlled by § 8 (b) of the National Labor Relations Act[1] which makes it an unfair labor practice for a union
“(4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce . . . where ... an object ... is ... (B) forcing or requiring any person to cease using, selling ... or otherwise dealing in the products of any other producer, processor, *213 or manufacturer, or to cease doing business with any other person . . .
with a proviso that
“nothing contained in . . . [the above provisions] shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers . . . that a product or products are produced by an employer with whom . . . [the union] has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution . . . .” (Emphasis added.)
The Labor Board found the Union's picketing at Safeway stores, though peaceful, unlawful per se under § 8 (b) (4) (ii) (B), and issued an appropriate order. The Court of Appeals reversed, holding the picketing lawful in the absence of any showing that Safeway had in fact been “threatened, coerced, or restrained” (113 U. S. App. D. C. 356, 360-363, 308 F. 2d 311, at pp. 315-318), and remanded the case to the Board for further proceedings. This Court now rejects (correctly, I believe) the Court of Appeals’ holding, but nevertheless refuses to enforce the Board’s order. It holds that although § 8 (b) (4) (ii) (B) does automatically outlaw peaceful secondary consumer picketing aimed at all products handled by a secondary employer, Congress has not, with “the requisite clarity” (ante, p. 63), evinced a purpose to prohibit such picketing when directed only at the products of the primary employer. Here the Union’s picketing related only to Washington apples, not to all products carried by Safeway.
*214 Being unable to discern in § 8 (b)(4)(ii)(B) or in its legislative history any basis for the Court’s subtle narrowing of these statutory provisions, I must respectfully dissent.
I.
The Union’s activities are plainly within the letter of subdivision (4)(ii)(B) of § 8 (b), and indeed the Court’s opinion virtually concedes that much (ante, pp. 71-72). Certainly Safeway is a “person” as defined in those subdivisions; indubitably “an object” of the Union’s conduct was the “forcing or requiring” of Safeway, through the picketing of its customers, “to cease . . . selling, handling ... or otherwise dealing in” Washington apples, “the products of” another “producer”; and consumer picketing is expressly excluded from the ameliorative provisions of the proviso. See supra, pp. 80-81.
Nothing in the statute lends support to the fine distinction which the Court draws between general and limited product picketing. The enactment speaks pervasively of threatening, coercing, or restraining any person; the proviso differentiates only between modes of expression, not between types of secondary consumer picketing. For me, the Court’s argument to the contrary is very unconvincing.
The difference to which the Court points between a secondary employer merely lowering his purchases of the struck product to the degree of decreased consumer demand and such an employer ceasing to purchase one product because of consumer refusal to buy any products, is surely too refined in the context of reality. It can hardly be supposed that in all, or even most, instances the result of the type of picketing involved here will be simply that suggested by the Court. Because of the very nature of picketing there may be numbers of persons who will refuse to buy at all from a picketed store, either out of economic or social conviction or because they prefer *215 to shop where they need not brave a picket line. Moreover, the public can hardly be expected always to know or ascertain the precise scope of a particular picketing operation. Thus in cases like this, the effect on the secondary employer may not always be limited to a decrease in his sales of the struck product. And even when that is the effect, the employer may, rather than simply reducing purchases, from the primary employer, deem it more expedient to turn to another producer whose product is approved by the union.
The distinction drawn by the majority becomes even more tenuous if a picketed retailer depends largely or entirely on sales of the struck product. If, for example, an independent gas station owner sells gasoline purchased from a struck gasoline company, one would not suppose he would feel less threatened, coerced, or restrained by picket signs which said “Do not buy X gasoline” than by signs which said “Do not patronize this gas station.” To be sure Safeway is a multiple article seller, but it cannot well be gainsaid that the rule laid down by the Court would be unworkable if its applicability turned on a calculation of the relation between total income of the secondary employer and income from the struck product.
The Court informs us that “Peaceful consumer picketing to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer, is poles apart from such picketing which only persuades his customers not to buy the struck product,” ante, p. 70. The difference was, it is stated, “well established in the state cases by 1940,” ante, p. 64, note 7, that is, before the present federal enactment. In light of these assertions, it is indeed remarkable that the Court not only substantially acknowledges that the statutory language does not itself support this distinction (ante, pp. 71-72)[2] *216 but cites no report of Congress, no statement of a legislator, not even the view of any of the many commentators in the area, in any way casting doubt on the applicability of § 8 (b) (4) (ii)(B) to picketing of the kind involved here.
II.
The Court’s distinction fares no better when the legislative history of § 8 (b) (4) (ii) (B) is examined. Even though there is no Senate, House, or Conference Report which sheds light on the matter, that hardly excuses the Court’s blinding itself to what the legislative and other background materials do show. Fairly assessed they, in my opinion, belie Congress’ having made the distinction upon which the Court’s thesis rests. Nor can the Court find comfort in the generalization that “ ‘In the sensitive area of peaceful picketing Congress has dealt explicitly with isolated evils which experience has established flow from such picketing’ ” {ante, pp. 62-63); in enacting the provisions in question Congress toas addressing itself to a particular facet of secondary boycotting not dealt with in prior legislation, namely, peaceful secondary consumer picketing. I now turn to the materials which illuminate what Congress had in mind.
*217 It is clear that consumer picketing in connection with secondary boycotting was at the forefront of the problems which led to the amending of the Taft-Hartley Act by the Labor-Management Reporting and Disclosure Act of 1959. See, e. g., remarks of Senator McClellan, 105 Cong. Rec. 3951, II Leg. Hist. 1007; remarks of Congressman Lafore, 105 Cong. Rec. 3928, II Leg. Hist. 1471; remarks of Congressman Griffin, infra, note 4. During Senate debate before passage of the Kennedy-Ervin bill, Senator Humphrey criticized an amendment proposed by Senator Goldwater to § 8 (b)(4) of the Taft-Hartley Act, which reflected the position of the Administration and was incorporated in substance in the Landrum-Griffin bill passed by the House. He said:
“To distribute leaflets at the premises of a neutral employer to persuade customers not to buy a struck product is one form of consumer appeal. To peacefully picket the customer entrances, with a placard asking that the struck product not be bought, is another form. I fear that consumer picketing may also be the target of the words 'coerce, or restrain.’ I fear that, in addition to the existing foreclosure of the union on strike from making any effective appeal to the employees of the so-called neutral employer, the union by this amendment is now to be effectively sealed off from even an appeal to the consumers.” 105 Cong. Rec. 6232, II Leg. Hist. 1037.
Reporting on the compromise reached by the Conference Committee on the Kennedy-Ervin and Landrum-Griffin bills, Senator Kennedy, who chaired the Conference Committee, stated:
“[T]he House bill prohibited the union from carrying on any kind of activity to disseminate informational material to secondary sites. They could not *218 say that there was a strike in a primary plant. . . . Under the language of the conference, [ultimately resulting in present § 8 (b)(4) (ii)(B)] we agreed there would not be picketing at a secondary site. What was permitted was the giving out of handbills or information through the radio, and so forth.” 105 Cong. Rec. 17720, II Leg. Hist. 1389.
Senator Morse, one day later, explained quite explicitly his objection to the relevant portion of the bill reported out of the Conference Committee, of which he was a member:
“This bill does not stop with threats and with illegalizing the hot cargo agreement. It also makes it illegal for a union to 'coerce, or restrain.’ This prohibits consumer picketing. What is consumer picketing? A shoe manufacturer sells his product through a department store. The employees of the shoe manufacturer go' on strike for higher wages. The employees, in addition to picketing the manufacturer, also picket at the premises of the department store with a sign saying, ‘Do not buy X shoes.’ This is consumer picketing, an appeal to the public not to buy the product of a struck manufacturer.” 105 Cong. Rec. 17882, II Leg. Hist. 1426.[3]
Later the same day, Senator Kennedy spoke further on the Conference bill and particularized the union rights protected by the Senate conferees:
“(c) The right to appeal to consumers by methods other than picketing asking them to refrain from *219 buying goods made by nonunion labor and to refrain from trading with a retailer who sells such goods.
“Under the Landrum-Griffin bill it would have been impossible for a union to inform the customers of a secondary employer that that employer or store was selling goods which were made under racket conditions or sweatshop conditions, or in a plant where an economic strike was in progress. We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing. In other words, the union can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site.” 105 Cong. Rec. 17898-17899, II Leg. Hist. 1432.
The Court does not consider itself compelled by these remarks to conclude that the Conference Committee meant to prohibit all secondary consumer picketing. A fair reading of these comments, however, can hardly leave one seriously in doubt that Senator Kennedy believed this to be precisely what the Committee had done; the Court's added emphasis on the word “and” (ante, p. 70) is, I submit, simply grasping at straws, if indeed the phrase relied on does not equally well lend itself to a disjunctive reading. Cf. DeSylva v. Ballentine, 351 U. S. 570, 573. The complicated role the Court assigns to the publicity proviso (ante, pp. 70-71) makes even less understandable its failure to accord to the remarks of Senator Kennedy their proper due. The proviso, according to the Court’s interpretation, is unnecessary in regard to picketing designed to effect a boycott of the primary product and comes into play only if a complete boycott of the secondary employer is sought. Had this ingenious interpreta *220 tion been intended, would not Senator Kennedy, who was at pains to emphasize the scope of activities still left to unions, have used it to refute the criticisms of Senator Morse made only shortly before?
Further, Senator Goldwater spoke in favor of the Conference bill and pointed out that in contrast to the Senate bill, which he had opposed, “[t]he House bill . . . closed up every loophole in the boycott section of the law including the use of a secondary consumer picket line . . . .” 105 Cong. Rec. 17904, II Leg. Hist. 1437.
The Court points out that the Senate had no Conference Report when it passed the compromise bill and that it had only Senator Kennedy’s statement of the purpose of the proviso. (Ante, pp. 69-70.) But I am wholly at a loss to understand how on that premise (particularly when Senator Kennedy’s remarks are supplemented by the comments of one Senator (Morse) who thought the final bill too harsh and those of another (Goldwater) who believed the Senate bill too weak) one can conclude that the members of the Senate did not mean by their vote to outlaw all kinds of secondary consumer picketing.
A reading of proceedings in the House of Representatives leads to a similar conclusion regarding the intent of that body. In criticism of the Landrum-Griffin bill, Congressman Madden stated, “It would prohibit any union from advising the public that an employer is unfair to labor, pays substandard wages, or operates a sweatshop . . . .” 105 Cong. Rec. 15515, II Leg. Hist. 1552. Since the theory of the majority regarding the publicity proviso adopted by the Conference is that it is redundant in situations where the union seeks only a boycott of the struck product, the sweep of Congressman Madden’s comment is plainly at odds with the Court’s view of § 8 (b) (4)(ii)(B).
Indicative of the contemporaneous understanding is an analysis of the bill prepared by Congressmen Thompson *221 and Udall and inserted in the Congressional Record, in which a hypothetical case, as directly in point as the department store example used by Senator Morse, is suggested:
“Suppose that the employees of the Coors Brewery were to strike for higher wages and the company attempted to run the brewery with strikebreakers. Under the present law, the union can ask the public not to buy Coors beer during the strike. It can picket the bars and restaurants which sold Coors beer with the signs asking the public not to buy the product. It can broadcast the request over the radio or in newspaper advertisements.
“The Landrum bill forbids this elementary freedom to appeal to the general public for assistance in winning fair labor standards.” 105 Cong. Rec. 15540, II Leg. Hist. 1576.
The majority (ante, pp. 67-68) relies on remarks made by Congressman Griffin, the bill’s co-sponsor. When read in context what seems significant about them is that the Congressman nowhere suggests that there can be some kind of consumer picketing which does not coerce or restrain the secondary employer. Nor does he intimate any constitutional problem in prohibiting picketing that follows the struck product.[4]
*222 After passage of the Landrum-Griffin bill, Congressman Thompson presented to the House an analysis of the differences between the House and Senate bills prepared *223 by Senator Kennedy and himself. This described the nature of secondary boycotts:
“In all cases of secondary boycotts two employers are involved. The union brings pressure upon the employer with whom it has a dispute (called the ‘primary’ employer) by inducing the employees of another employer (called the ‘secondary’ employer) to go on strike — or the customers not to patronize— until the secondary employer stops dealing with the primary employer. Or the union may simply induce the employees of the secondary employer to refuse to handle or work on goods — or the customers not to buy — coming from the primary employer as a way of putting pressure upon him.” 105 Cong. Rec. 16589, II Leg. Hist. 1706. (Emphasis added.)
The prepared analysis then discusses the effect of the House bill on consumer picketing, 105 Cong. Rec. 16591, II Leg. Hist. 1708. To describe activities outlawed by the House bill, it uses the same “Coors beer” hypothetical which the earlier analysis had employed. This analysis shows beyond peradventure that Senator Kennedy did believe the language of the bill to proscribe all consumer picketing and indicates that this view was squarely placed before the House. The Court adverts to this analysis (ante, p. 69), as the genesis of the publicity proviso, but fails to acknowledge the difficulty of squaring the great concern of the Senate conferees to protect freedom of communication with the Court’s supposition that the House bill closed off no lines of communication so long as the union appeal was limited to boycott of the struck products.
Congressman Griffin placed in the Congressional Record, 105 Cong. Rec. 18022, II Leg. Hist. 1712, a preliminary report on the Conference agreement. A summary analysis of Taft-Hartley amendments states that the *224 House bill “Prohibits secondary customer picketing at retail store which happens to sell product produced by manufacturer with whom union has dispute.” The Conference agreement, according to this summary, “Adopts House provision with clarification that other forms of publicity are not prohibited; also clarification that picketing at primary site is not secondary boycott.”
When Congressman Thompson spoke to the Conference agreement, he reiterated his view of the House bill and of its modification, 105 Cong. ReC. 18133, II Leg. Hist. 1720, 1721. Specifically he stated, “All appeals for a consumer boycott would have been barred by House bill.”
In the light of the foregoing, I see no escape from the conclusion that § 8 (b) (4) (ii) (B) does prohibit all consumer picketing. There are, of course, numerous times in the debates of both houses in which consumer picketing is referred to generally or the reference is made with an example of an appeal to consumers not to purchase at all from the secondary employer. But it is remarkable that every time the possibility of picketing of the sort involved in this case was considered, it was assumed to be prohibited by the House bill. Admittedly, in the House, appeals to refrain from purchase of the struck product were discussed only by opponents of the House bill; however, only one of two inferences can be drawn from the silence of the bill’s supporters. Either the distinction drawn by this Court was not considered of sufficient significance to require comment, or the proponents recognized a difference between the two types of consumer picketing but assumed that the bill encompassed both. Under either supposition, the conclusion reached by the Court in regard to the picketing involved here is untenable.
*225 III.
Under my view of the statute the constitutional issue is therefore reached. Since the Court does not discuss it, I am content simply to state in summary form my reasons for believing that the prohibitions of § 8 (b)(4)(ii)(B), as applied here, do not run afoul of constitutional limitations. This Court has long recognized that picketing is “inseparably something more [than] and different” from simple communication. Hughes v. Superior Court, 339 U. S. 460, 464; see, e. g., Building Service Employees v. Gazzam, 339 U. S. 532, 537; Bakery Drivers v. Wohl, 315 U. S. 769, 776 (concurring opinion of Douglas, J.). Congress has given careful and continued consideration to the problems of labor-management relations, and its attempts to effect an accommodation between the right of unions to publicize their position and the social desirability of limiting a form of communication likely to have effects caused by something apart from the message communicated, are entitled to great deference. The decision of Congress to prohibit secondary consumer picketing during labor disputes is, I believe, not inconsistent with the protections of the First Amendment, particularly when, as here, other methods of communication are left open.[5]
Contrary to my Brother Black, I think the fact that Congress in prohibiting secondary consumer picketing has acted with a discriminating eye is the very thing that renders this provision invulnerable to constitutional attack. That Congress has permitted other picketing which is likely to have effects beyond those resulting from the “communicative” aspect of picketing does not, of course, in any way lend itself to the conclusion that *226 Congress here has aimed to “prevent dissemination of information about the facts of a labor dispute” (ante, p. 78). Even on the highly dubious assumption that the “non-speech” aspect of picketing is always the same whatever the particular context, the social consequences of the “non-communicative” aspect of picketing may certainly be thought desirable in the case of “primary” picketing and undesirable in the case of “secondary” picketing, a judgment Congress has indeed made in prohibiting secondary but not primary picketing.
I would enforce the Board’s order.

 As amended by the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act) §704 (a), 73 Stat. 542-543, 29 U. S. C. (Supp. IV, 1963) §158 (b)(4).

 The Court seeks to find support for its limited interpretation of the language of § 8 (b) (4) in Congress’ explicit mention of picketing *216 in § 8 (b)(7). Ante, p. 68. The answer to this is twofold: First, § 8 (b) (7) regulates only picketing (in the context of organizational and recognitional disputes), while §8 (b)(4) covers a wide range of activities, of which picketing is only one. Second, even if the argument had substance, it would not aid the Court’s resolution of this case. The Court recognizes that § 8 (b) (4) does make illegal per se consumer picketing designed to accomplish a complete boycott of the secondary employer. It in effect admits, ante, pp. 71-72, that the language “threaten, coerce, or restrain” does not suggest any distinction between such picketing and that directed only at the struck product. It follows, even on the Court’s own analysis, that the breadth of the language of § 8 (b) (4) provides no support for a view that Congress did not mean to render illegal per se the kind of picketing involved here.

 Senator Morse continued by quoting Goldfinger v. Feintuch, 276 N. Y. 281, 11 N. E. 2d 910, which he believed established the legitimacy of such picketing. The Court now cites the same case, ante, p. 64, as a state decision recognizing the distinction on which the opinion is based, apparently without reflecting on the anomaly that the case is used in debate as an example of the kind of activity § 8 (b) (4) (ii) (B) prohibits.

 The colloquy between Congressmen Griffin and Brown on the Landrum-Griffin bill, from which the excerpt of the Court is taken, reflects a plain intent to outlaw consumer picketing; the caveat regarding the right of free speech appears to be only an acknowledgment of the general principle that any legislation is subject to constitutional limitations:
“Mr. BROWN of Ohio. . . .
“My question concerns the picketing of customer entrances to retail stores selling goods manufactured by a concern under strike. Would that situation be prohibited under the gentleman’s bill?
“Mr. GRIFFIN. Let us take for example the case that the President talked about in his recent radio address. A few news *222 papers reported that the secondary boycott described by the President would be prohibited under the present act. It will be recalled that the case involved a dispute with a company that manufactured furniture. Let us understand that we are not considering . . . the right to picket at the manufacturing plant where the dispute exists.
“Mr. BROWN. That is right. We are looking only at the problem of picketing at a retail store where the furniture is sold.
“Mr. GRIFFIN. Then, we are not talking about picketing at the place of the primary dispute. We are concerned about picketing at a store where the furniture is sold. Under the present law, if the picketing happens to be at the employee entrance so that clearly the purpose of the picketing is to induce the employees of the secondary employer not to handle the products of the primary employer, the boycott could be enjoined.
“However, if the picketing happened to be around at the customer entrance, and if the purpose of the picketing were to coerce the employer not to handle those goods, then under the present law, because of technical interpretations, the boycott would not be covered.
“Mr. BROWN. In other words, the Taft-Hartley Act does not cover such a situation now?
“Mr. GRIFFIN. The way it has been interpreted.
“Mr. BROWN. But the Griffin-Landrum bill would?
“Mr. GRIFFIN. Our bill would; that is right. If the purpose of the picketing is to coerce or to restrain the employer of that second establishment, to get him not to do business with the manufacturer — then such a boycott could be stopped.
“Mr. BROWN. . . . Would that same rule apply to the picketing at the customer entrances, for instance, of plumbing shops, or newspapers that might run the advertising of these concerns, or radio stations that might carry their program?
“Mr. GRIFFIN. Of course, this bill and any other bill is limited by the constitutional right of free speech. If the purpose of the picketing is to coerce the retailer not to do business with the manufacturer, whether it is plumbing—
“Mr. BROWN. Advertising.
“Mr. GRIFFIN. Advertising, or anything else, it would be covered by our bill. It is not covered now.” 105 Cong. Rec. 15672-15673, II Leg. Hist. 1615,

 I mean to intimate no view on the constitutionality of the regulation or prohibition of picketing which publicizes something other than a grievance in a labor-management dispute.